Johnson, J.
 

 The action below was instituted on a
 
 *259
 
 policy of insurance. On behalf of the insurers, it was contended, that the policy was forfeited by committing a breach of blockade.
 

 It is not, and cannot be made a question, that this is one of those acts which will exonerate the underwriters from their liability. The only point below was relative to the evidence upon which the commission of *the act may be substantiated. A sentence of a British prize court in L Barbadoes was given in evidence, by which it appeared, that the vessel was condemned for attempting to commit a breach of blockade. It is the English doctrine, and the correct doctrine on the law of nations, that an attempt to commit a breach of blockade, is a violation of belligerent rights, and authorizes capture. This doctrine is not denied, but the plaintiff contends, that he did not commit such an attempt, and the court below permitted evidence to go to the jury to disprove the fact on which the condemnation professes to proceed. On this point, I am of opinion, that the court below erred.
 

 I do not think it necessary to go through the mass of learning on this subject, which has so often been brought to the notice of this court, and particularly in the case of
 
 Fitzsimmons,
 
 argued at this term. Nearly the whole of it will be found very well summed up in the 18th chapter of Mr. Park’s Treatise. The doctrine appears to me to rest upon three very obvious considerations ; the propriety of leaving the cognisance of prize questions exclusively to courts of prize jurisdiction ; the very great inconvenience, amounting nearly to an impossibility, of fully investigating such cases in a court of common law, and the impropriety of revising the decisions of the maritime courts of other nations, whose jurisdiction is co-ordinate throughout the world.
 

 It is sometimes contended, that this doctrine is novel, and that it takes its origin in an incorrect extension of the principle in
 
 Hughes
 
 v.
 
 Cornelius.
 
 I am induced to believe, that it is coeval with the species of contract to which it is applied. Policies of insurance are known to have been brought into England from a country that acknowledged the civil law. This must have been the law of policies, at the time when they were considered as contracts proper for the admiralty jurisdiction, and were submitted to the court of policies, established in the reign of Elizabeth. It is probable, that, at the time when the common law assumed to itself exclusive jurisdiction of the contract of insurance, the rule was *too much blended with the r¡¡! law of policies to have been dispensed with, had it even been incon- L sistent with common-law principles. But, in fact, the common law had sufficient precedent for this rule, in its own received principles relative to sentences of the civil-law courts of England. It may be true, that there are no cases upon this subject prior to that of
 
 Hughes
 
 v.
 
 Cornelius,
 
 but this does not disprove the existence of the doctrine. There can be little necessity for reporting decisions upon questions that cannot be controverted. Since the case of
 
 Hughes
 
 v.
 
 Cornelius,
 
 the doctrine has frequently been brought to the notice of the courts of Great Britain, in insurance cases, but always with a view to contest its applicability to particular cases, or to restrict the general doctrine by exceptions, but the existence of the rule, or its applicability to actions on policies, is nowhere controverted.
 

 I am of opinion, that the sentence of condemnation was conclusive evidence of the commission of the offence for which the vessel was con
 
 *260
 
 demned, and as that offence was one wbicb vitiated the policy, the defendants ought to have had a verdict.
 

 Washington, J.
 

 The single question in this case is, whether the sentence of the admiralty court at Barbadoes, condemning the brig Fame and her cargo as prize, for an attempt to break the blockade of Martinique, is conclusive evidence against the insured, to falsify his warranty of neutrality, notwithstanding the fact stated in the sentence as the ground of condemnation is negatived by the jury ?
 

 This question has long been at rest in England. The established law upon this subject, in the courts of that country, is, that the sentence of a foreign court of competent jurisdiction condemning the property upon the ground that it was not neutral, is so entirely conclusive of the fact so decided, that it can never be controverted, directly or collaterally, in any other court having concurrent jurisdiction. This doctrine seems to result # 1 from the application of a legal principle which prevails in respect to ‘J domestic judgments, to the judgments and sentences of foreign courts.
 

 It is a well-established rule in England, that the judgment, sentence or decree of a court of exclusive jurisdiction, directly upon the point, may be given in evidence, as conclusive between the same parties, upon
 
 the
 
 same matter coming incidentally in question in another court for a different purpose. It is not only conclusive of the right which it establishes, but of the fact which it directly decides. This rule, when applied to the sentences of courts of admiralty, whether foreign or domestic, produces the doctrine which I am now considering, upon the ground that all the world are parties in an admiralty cause. The proceedings are
 
 in rem, but
 
 any person having an interest in the property may interpose a claim, or may prosecute an appeal from the sentence. The insured is emphatically a party, and in every instance, has an opportunity to controvert the alleged grounds of condemnation, by proving, if he can, the neutrality of the property. The master is his immediate agent, and he is also bound to act for the benefit of all concerned, so that, in this respect, he also represents the insurer. That irregularities have sometimes taken place, to the exclusion of a fair hearing of the parties, is not to be denied. But this furnishes no good reason against the adoption of a general rule. A spirit of comity has induced the courts of England to presume, that foreign tribunals, whether of prize or municipal jurisdiction, will act fairly, and will decide according to the laws which ought to govern them; and public convenience seems to require, that a question, which has once been fairly decided, should not be again litigated between the same parties, unless in a court of appellate jurisdiction.
 

 The irregular and unjust decisions of the French courts of admiralty, of late years, have induced even English judges to doubt of the wisdom of the above doctrine, in relation to foreign sentences, but which they have acknowledged to be too well established for English tribunals to shake ; and the justice with which the same '*charge is made by all neutral
 
 ^
 
 nations against the English as well as against the French courts of admiralty, during the same period, has led many American jurists to question the validity of the doctrine, in the courts of our own country. It is said to be a novel doctrine, lately sprung up, and acted upon as a rule of decision
 
 *261
 
 in the English courts, since the period when English decisions have lost the weight of authority in the courts of the United States. It is this position which I shall now examine, acknowledging that I do not hold myself bound by such decisions made since the revolution, although, as evidence of what the law was prior to that period, I read and respect them.
 

 The authority of the case of
 
 Hughes
 
 v.
 
 Cornelius,
 
 the earliest we meet with as to the conclusiveness of a foreign sentence, is admitted ; but its application to a question arising under a warranty of neutrality between the insurer and insured, is denied. It is true, that, in that case, the only point expressly decided was, that the sentence was conclusive as to the change of property effected by the condemnation. But it is obvious, that the point decided in that case depended, not upon some new principle peculiar to the sentences of foreign courts, but upon the application of a general rule of law to such sentence.
 

 This case, as far as it goes, places a foreign sentence upon the same foundation as the sentence or decree of an English court, acting upon the same subject; and we have seen that, by the general rule of law, the latter, if conclusive at all, is so as to the fact directly decided, as well as to the change of property produced by the establishment of the fact. Hence, it would seem to follow, that if the sentence of a foreign court of admiralty be conclusive as to the property, it is equally conclusive of the matter or fact directly decided. What is the matter decided in the case under consideration? That the vessel was seized, whilst attempting to break a blockade, in consequence of which she lost her neutral character ; and the change of property produced by the sentence of condemnation is a consequence of the matter decided, that she was, in effect, enemy-property. Can the parties to that sentence be bound by so much of *it as works a ¡-*400 loss of the property, because it was declared to be enemy-property, *- and yet be left free to litigate anew, in some other form, the very point decided, from which this consequence flowed ? Or, upon what just principle, let me ask, shall a party to a suit, who has once been heard, and whose rights have been decided by a competent tribunal, be permitted, in another court of concurrent jurisdiction, and in a different form of action, to litigate the same question, and to take another chance for obtaining a different result ? I confess, I am strongly inclined to think, that the case of
 
 Hughes
 
 v.
 
 Cornelius
 
 had a strong foundation for the doctrine which was built upon it, and which for many years past has been established law in England. This opinion is given with the more confidence, when I find it sanctioned by the positive declarations of distinguished law characters; men who are, of all others, the best able to testify respecting the course of decisions upon the doctrine I am examining, and the source from which it sprung.
 

 In the case of
 
 Lothian
 
 v.
 
 Henderson,
 
 3 Bos.
 
 &
 
 Pul. 499, Chambee, J., speaking upon this point, says, that the sentence of the French court was in that case conclusive against the claim of the assured, “ agreeable to all the decisions upon the subject, beginning with the case of
 
 Hughes
 
 v.
 
 Cornelius
 
 (confirmed as that was by the opinion of Lord Holt in two subsequent cases), and pursuing them down to the present period. It is true,” he observes, “ that in
 
 Hughes
 
 v.
 
 Cornelius,
 
 the question upon the foreign sentence arose in an action of trover, and not in an action on a policy of assurance, where the non-compliance with a warranty of neutrality is in dispute. But
 
 *262
 
 from that period to the present, the doctrine there laid down respecting foreign sentences has been considered equally applicable to questions of warranty in actions on policies, as to questions of property in actions of trover.” Le Blanc, J., says, “ that these sentences are admissible and conclusive evidence of the fact they decide, it seems not safe now to question : from the time of Car. II., to this day, they have been received as such, without being questioned. In the discussion of the nature of such evidence,
 
 *4401
 
 before *bis *house, in 1776, it seems not to have been controverted ; -* and the cases, I may say, are numberless, and the property immense, which have been determined on the conelusiveness of such evidence, in many of which cases, the forms in which they came before the courts in Westminster Hall were such, as to have enabled the parties, if any doubt had been entertained, to have brought the question before a higher tribunal.” Lawrecne, J., also speaking of the legal effect of a foreign sentence upon this point, says,
 
 “
 
 as to which, after the continued practice which has taken place from the earliest period, in which, in actions on policies of insurance, questions have arisen on warranties, to admit such sentences in evidence, not only as conclusive
 
 in rem,
 
 but also as conclusive of the several matters they purport to decide directly, I apprehend it is now too late to examine the practice of admitting them to the extent to which they have been received, supposing that practice might, upon the argument, have appeared to have been doubtful at first.” Rooke, J., Lord Eldon, and Lord Alvanley, all concur in giving the same testimony, that the doctrine under consideration had been established for a long period of years, by a long series of adjudications, in the courts of Westminster Hall.
 

 I cite this case for no other purpose but to prove, by the most respectable testimony, that the case of
 
 Hughes
 
 v.
 
 Cornelius,
 
 decided in the reign of Car. II., had, by a uniform course of decisions from that time, been considered as warranting the rule now so firmly established in England. And when the inquiry is, whether the application of the principle laid down in that case to questions arising on warranties in actions on policies, be of ancient or modern date, I think, I may safely rely upon the declarations of the English judges, when they concur in the evidence they give respecting the fact. It is true, that no case was cited at the bar, recognising the application of the rule to questions between the insurer and assured, prior to the revolution, except that of
 
 Fernandez
 
 v.
 
 Da Costa,
 
 which I admit was a
 
 nisi prius
 
 decision. But were I convinced, that the long series of decisions upon this point, from the time of
 
 Hughes
 
 v.
 
 Cornelius,
 
 spoken of by the judges in the case of
 
 Lothian
 
 v.
 
 Henderson,
 
 had been made at
 
 nisi prius, *aat!
 
 ^ not m my mind, weaken the authority of the doctrine. It J would prove the sense of all the judges of England, as well as of the bar, of the correctness and legal validity of the rule. It is not to be supposed, that if a doubt had existed respecting the law of those decisions, the point would not have been reserved for a more deliberate examination, before some of the courts of Westminster Hall. But the case of
 
 Fernandez
 
 v.
 
 Da Costa
 
 receives additional weight, when it is recollected, that the judge who decided it was Lord Mansfield, and when, upon examining it, we find no intimation from him that there was any novelty at that day in the doctrine. To this strong evidence of the antiquity of the rule, may be added
 
 *263
 
 that of Judge Duller, who, at the time he wrote his
 
 Nisi Prius,
 
 considered it as then established.
 

 That the doctrine was considered as perfectly fixed, in the year 1781, is plainly to be inferred, from the case of
 
 Bernardi
 
 v.
 
 Motteux,
 
 decided in that year. Lord Mansfield speaks of it as he would of any other well-established principle of law, declaring, in general terms, that the sentence, as to that which is within it, is conclusive against all persons, and cannot be collaterally controverted in any other suit. The only difficulty in that case was, to discover the real ground upon which the foreign sentence proceeded, and the court in that, and many subsequent cases,- laid down certain principles auxiliary to the rule, for the purpose of ascertaining the real import of the sentence in relation to the fact decided as between the insurer and assured. For, if the sentence did not proceed upon the ground of the property not being neutral, it, of course, concluded nothing against the assured ; since upon no other ground could the sentence be said to falsify the warranty.
 

 It was admitted by the counsel for the assured, that as between him and the insurer, the sentence isy>
 
 rimú facie
 
 evidence of a non-compliance with the warranty. But if they are right in their arguments as to the inconclusiveness of the sentence, I would ask for the authority upon which the sentence can be considered as
 
 prima, facie
 
 evidence. Certainly, no case was referred *to, and I have not met with one to warrant the position. If we look to general principles, applicable to domestic judgments, they are opposed to it. We have seen, that the judgment is conclusive between the same parties, upon the same matter coming incidentally in question. The judgment of a foreign court is equally conclusive, except in the single instance where the party claiming the benefit of it applies to the courts in England to enforce it, in which case only, the judgment is
 
 primd facie
 
 evidence. But it is to be remarked, that in such a case, the judgment is no more conclusive as to the right it establishes, than as to the fact it decides. Now, it is admitted, that the sentence of a foreign court of admiralty is conclusive upon the ■ right to the property in question ; upon what principle, then, can it be
 
 primd facie
 
 evidence, if not conclusive upon the facts directly decided. A domestic judgment is not
 
 even primd facie
 
 evidence between those not parties to it, or those claiming under them, and that would clearly be the rule, and for a similar reason as to foreign judgments. If, between the same parties, the former is conclusive as to the right and as to the facts decided, this principle, if applied at all to> foreign sentences, which it certainly is, is either applicable throughout, upon the ground, that the parties are the same, or, if not so, then, by analogy to the rule applying to domestic judgments, the sentence cannot be evidence at all.
 

 Upon the whole, I am clearly of opinion, that the sentence of the court of admiralty at Barbadoes, condemning the brig Fame and her cargo as prize, on account of an attempt to break the blockade of Martinique, is conclusive evidence in this case against the assured, to falsify his warranty of neutrality.
 

 If the injustice of the belligerent powers, and of their courts, should render this rule oppressive to the citizens of neutral nations, I can only say with the judges who decided the case of
 
 Hughes v. Cornelius,
 
 let the government in its wisdom adopt the proper means to remedy the mischief.
 

 
 *264
 
 I hold the rules of law, when once firmly established, to be beyond the con-*443] trol *of those who are merely to pronounce what the law is, and if from any circumstance it has become impolitic, in a national point of
 

 view, it is for the nation to annul or to modify it. Until this be done, by the competent authority, I consider the rule to be inflexible,
 
 (a)
 

 (a)
 

 Judges Ohj.se and Livingston dissented; and Judge Todd, not having been present at the argument, gave no opinion. So that this judgment is reversed by the opinions of Marshall, Oh. J., Cushing, Washington and Johnson, Justices.