Choate, D. J.
This is a libel in rem against a foreign vessel, upon a contract made by the master with the libellant, for labor and services in removing the ballast, while in this port, for the purpose of putting her in condition to receive the cargo for her intended voyage. The libel avers that the services were performed on the credit of the vessel. The owner has appeared as claimant, and excepts to the libel on the following grounds: First, that the same does not state facts sufficient to constitute a maritime lien or cause of aetion herein; second, that the court has no jurisdiction upon the allegations of the libel; third, that the action is founded upon a contract to pay for services performed by the libellant as stevedore, in unloading the said bark.
*723 It is argued for the claimant that the contract sued on is not a maritime contract, and that it cannot be distinguished in principle from the contract of the master with the stevedore for unlading the ship, which, it is claimed, has been held not to be a maritime contract, giving a lien on the ship for its enforcement, or of which the admiralty has jurisdiction.
In the case of The Amstel, Bl. & H. 215, (1831,) the question, whether a stevedore has a lien on the vessel for his services, came before this court, and it was held by Judge Betts that the suit in rem could not be maintained. He says: “This action is resisted in the first place on the ground that the libellant has no lien upon the vessel, because his services as a stevedore were not in their nature maritime, and were really performed on land. It is to be remarked that the services consisted of nothing done to the vessel in her repairing and refitting, but of labor expended partly on board and partly on shore in discharging her cargo. This description of service has never yet been recognized as of a privileged order. It does not fall within the extensive list of debts privileged by the civil law, nor does it seem to be comprehended within the principle upon which a lien or privilege is allowed. A vessel is made chargeable with certain services because they are necessary for her preservation or useful employment. Under this head is embraced the compensation of material men and others for labor done upon the vessel, or in her navigation, or in promoting the health or comfort of the ship’s company on a voyage. The language of the civil law has direct reference to this description of service, and the French law, which gives a broader application to the privilege than has ever been yielded in England, does not extend it beyond those engaged in labors connected with the equipment or refitment of the vessel, either in respect to the vessel herself or her necessary stores, her crew,' etc., or in services performed on her during her voyage. The American law has rever gone beyond the doctrines recognized in the continental courts of Europe, and it seems to me that it would be s departure from the well-understood *724 terms of the maritime law in this respect, and from the principle which pervades its enactments, to give a lien upon the vessel to a claim of the character of the one now under consideration. It in no respects merits such privileges any more than do the services of any other class of laborers in any work connected with the business of the ship. It does not seem to differ from a transportation of the cargo from one plaee to another on the land, and the cartman who hauls off the lading and facilitates the discharge of the vessel aids her in the same manner as the laborer who raises the cargo from the hold.”
The learned judge also found in that case an additional reason for denying the lien: that the services were in fact not performed upon the credit of the vessel, but upon the personal credit of the master.
In The Bark Joseph Cunard, Olc. 123, (1845), Judge Betts adhered to this ruling and denied the lien of the stevedores, and, as within the same principle, rejected the claim of lightermen who took the cargo from the shore to the ship while lying in the port of Mobile. The vessel was under a charter which relieved the ship as between her and the charterers from the expense of loading the vessel. This circumstance, however, does not seem to form the ground of the decision. Beferring to these two charges for stevedores and lighterage, Judge Betts says: “It is an employment outside of the vessel, not contributing to her capabilities or security in navigation, or serviceable to her voyage. There is no difference in principle whether the cargo is brought to her side in the stream, or placed near her on a wharf. The ship is responsible for disbursements necessary to equip and put her in a condition (by men, provisions, etc.) to perform her voyage; but it would be giving a novel extension to the notion and range of tacit liens to subject her to all claims collateral and incidental to her dispatch. A cargo is no more than an incident to a voyage, and in no sense necessary to enable the ship to perform one. Debts arising out of such collateral services or engagements may be chargeable upon the owner personally, as resting upon his implied contracts; but the ship is not *725 necessarily pledged to their satisfaction more than for wages of the master, or other benefits to the mercantile adventure of the owner.”
In Cox v. Murray, 1 Abb. Adm. 341, (1848,) Judge Betts restates the grounds of the decision in the case of The Amstel.
In the case of The S. G. Owens, 1 Wall. Jr. 370, (1849,) Mr. Justice Grier held that a stevedore has no maritime lien upon a foreign vessel for services' in loading her. It was argued that the service was essentially maritime, being done on the ship, and essential to her carrying freight; that formerly the mariners performed this service, and had a lien for their wages, whether earned in port or at sea, and that the stevedore, who for reasons of convenience is substituted for the mariners, is entitled to the same lien. The court observed that the argument was ingenious, but not supported by authority; that no decision or dictum was cited which-would justify the court in treating this as a maritime service.. He cites against the claim Phillips v. The Sattergood, Gilpin, 3, in which Judge Hopkinson made it the test of a contract not being maritime — that it was neither made at sea nor for a service to be performed at sea, but made and to be performed while the vessel was moored at a wharf within the body of a county. He then adds: “The stevedores are usually employed by the owner, consignee, or master, on their personal credit; the service performed is in no sense maritime, being completed before the voyage is begun, or after it is ended, and they are no more entitled to a lien on the vessel than the draymen and other laborers who perform services in loading and discharging vessels.”
It cannot, however, I think, be denied, that later adjudications have established a far less narrow and restricted definition and test of what constitutes a maritime contract, of which the admiralty has jurisdiction, and, also, of the extent of the-maritime lien as an incident of such a contract, than that, contained in these early cases. Thus, in Ins. Co. v. Dunham, 11 Wall. 26, the supreme court says: “As to contracts, it has been equally well settled that the English rule, which concedes jurisdiction, with a few exceptions, only to contracts made- *726 upon, the sea, and to, he executed thereon, (making locality the, test,) is entirely inadmissible*, and that the, true criterion, is the nature and subject-matter of the contract, as, whether it was a, maritime contract, having reference, to. maritime service ox maritime transactions.”
In, the case of The A. R. Dunlap, 1 Low. 361, (1869,) Judge Lowell,followed, with, hesitation, the cases of TheAmstel, The Joseph Cunaré, and The St. C. Omens, remarking, however, that, the reason given that the service was. not maritime did not appear to; be decisive, because the contracts, of other material mem are. no more so, and that, the, reason given, that. the. cargo isi a collateral, matter, and no part of the necessary equipment ©f. the ship*, was also unsatisfactory, because a ship cannot he. used to advantage without a cargo. He. adhered to the rule, however, in respect, to stevedores, while doubting its correctness; as a point settled by authority.
In the case of. the Bank Ilex, 2. Woods, 229, (1876,) Mr. Justice; Bradley denied the lien of a stevedore as settled by authority, citing, Cox v. Murray, and The S. G. Owens. Referring* doubtless*, to. the: ease, of The A. R. Dunlap, he. says, that. Judge. LowelL thinks the reasons given in, Cox v. Murray are: no.t satisfactoryand referring to. Justice Grier’s views, in The. S* G. Omens, he says, they are so clear and forcible “that he, is not certain that he should come, to. a different conclusion, if the question were, a new one-” But in the case of The George T. Kemp., 2, Low. 482, (1876,) Judge Lowell reconsidered his decision in The A,. R. Dunlap, and came to the conclusion. that the courses of. reasoning in, the. early cases, which he had followed before, bad been declared unsound by the highest authority; so: that “an adherence to the mere result of those cases is. not, defensible, on the ground of stare decisis, because it is standing, by the. letter at the expense of the principle..,” Upon a careful review of the authorities he upheld the stevedore’s, claim for alien on the vessel, enforceable in. admiralty, as being for a maritime service.
The case of The. Ilex is, not cited by him. As it was decided but a, few months earlier it had not probably then been published.
*727 During the same year, and probably without the knowledge of either of these two decisions, Judge Welker held a stevedore entitled to a lien. The Schooner Senator, 3 N. Y. Wkly. Dig. 430. He cites no case directly to the point, but relies on the authority of The Williams, 1 Bro. 215, where Judge Emmons lays down the general rule, as the result of the authorities, that “all maritime contracts made within the scope of the master’s authority do per se hypothecate the ship;” and he cites also, with approval, the opinion of Judge Ware, in The Paragon, that “every contract with the master within the scope of his authority binds the vessel, and gives the creditor a lien for his security.” He then adds: “There certainly does not seem to be any difference in principle between this class of service and those performed by the sailors, the lightermen, the man who sets the rigging, who scrapes the bottom or paints the side of the vessel, or him who furnishes supplies, or tows the vessel in or out of port. They are all necessary to the general business of transportation of the cargo, and contribute to the reward of capital employed in the maritime service, and alike should be regarded as maritime service, and furnish a remedy against the vessel.”
Recurring to those considerations of commercial necessity and convenience, out of which it is supposed that this whole system of tacit hypothecation has grown, it is difficult, as matter of principle, to limit the range of maritime service and maritime contracts, which carry with them, as an essential part, a maritime lien enforceable in admiralty short of whatever services the master may require, and whatever eon-tracts he may find it necessary to make, as the agent of the foreign owner, in the performance of his duty in navigating and conducting the business of the ship, for the successful prosecution of the voyage or adventure upon which she has been dispatched by the owner; and this doctrine, which is inconsistent with that narrower principle by which the stevedore’s lien was denied, seems to have received the sanction of the supreme court of the United States.
Thus, in The Emily Souder, 17 Wall. 669, Mr. Justice *728 Field says: “The steamer was detained at Maranhara.nearly five weeks, and the moneys advanced by the libellants, it is true, were not entirely for the repairs to the vessel and the supplies needed for the voyage; they were intended and applied in part to meet the expenses of her towage into port and of pilotage, and to pay the custom-house dues, consular fees, and charges for medical attendance upon the sailors. These various items, however, stood in the same rank with necessary repairs and supplies to the vessel, and the libellants, advancing funds for their payment, were equally entitled as a security to a lien upon the vessel. ” And, again, speaking of the presumption that the money was advanced upon the credit of the vessel, the court says : “The presumption arises that such is the fact from the necessities of the vessel, and the position of the parties considered with reference to the motives which generally govern the conduct of individuals. Moneys are not usually loaned to strangers, residents of distant and foreign countries, without security, and it would be a violent presumption to suppose that any such course was adopted when ample security in the vessel was lying before the parties.”
This language is, of course, equally applicable to the parties who render services or supply anything necessary to the ship, as to those who furnish money to pay for the same. See, also, Ins. Co. v. Dunham, 11 Wall. 3; Thomas v. Osborn, 19 How. 28-30. In accordance with the same view it was held by Judge Benedict, in The Onore, 6 Ben. 564, that the service of a cooper rendered at the request of the master, in coopering casks to fit them for delivery according to the contract of affreightment, though rendered partly on the wharf, was a maritime service, which carried with it a lien on the vessel.
In England, the admiralty jurisdiction was, as is well understood, greatly curtailed through the action of the common-law courts. Yet when, by Stat. 3 and 4 Yict. c. 65, § 6, jurisdiction was conferred upon the admiralty eourt to enforce claims or demands for “necessaries supplied” to foreign ships, it was held that stevedores’ services were necessaries within the meaning of the act, and that stevedores had *729 a lien on the ship therefor. The Wabam, 1 Pr. Adm. Dig. (2d Eng. Ed.) 364.
It is, therefore, entirely clear that the rulings of this and other courts, excluding stevedores’ claims from the class of maritime contracts, can no longer be considered authority for the exclusion of services of an analogous character. If the rule as to stevedores is adhered to — a point which the court is not called on to decide in this case — it must be wholly on the doctrine of stare decisis, since it is now out of harmony with the accepted principles of maritime law as declared by the courts of admiralty. This is the view taken of the rule by Judge Benedict. The Circassian, 1 Ben. 209. In the present case there is, indeed, a very strong similarity between the services for which this suit is brought and the service of the stevedore. The work done is precisely of the same nature. The only distinction is in the subject-matter on which the labor is performed. In the one case it is work done in removing the cargo from the ship; in the other, it is work done in removing the ballast. This distinction is enough, however, to take the case out of the rule applicable to stevedores.
The ballast is not cargo. It is rather a part of the ship, like the boats, the sails, the anchors, the stores, and many other things that go to the full equipment of the vessel. The ballast is necessary to the complete and seaworthy ship, though unlike them it is so only under certain circumstances. While it is in its place in the ship it is to be regarded as a part of the ship and of her equipment. The service of removing it when she is to take on board her cargo is of the same character as would be the removal of the anchors, or stores, or part of the cargo, if required, for the purpose of lightening her, that she might cross a bar, or come up at the wharf at which she is to discharge her cargo. The facts that the service is rendered wholly in port, that the vessel is not actually on a voyage, that it may be partly rendered on the land, do not make it otherwise than a maritime service on the foregoing authorities.
Indeed, I think it may well be claimed that the service so *730 rendered comes fairly within the definition of maritime service as given by Judge Betts in The Amstel, as being “labor connected with the equipment or refitment of the vessel.” But, however this may be, I am of opinion that it is, from its nature and on the authorities, a maritime service, because it is “necsary for the ship, her voyage or business.” See, also, cases cited in 2 Low. 484; Ben. Adm. § 285.
Since the foregoing was written my attention has been called to a decision of Judge Dyer that the storage of the sails of a vessel on the land is not a maritime service, for which a suit in the admiralty will lie. Hubbard v. Roach, 12 Chic. L. News, 298, [2 Fed. Rep. 393.] He comments on and disapproves of the opinion of Mr. Benedict, cited above from his work on admiralty, to the effect that the stevedore’s service is maritime; and also his opinion that the storage of the sails is a maritime service. Ben. Adm. (2d Ed.) § 283.
The authorities, however, which were cited in Hubbard v. Roach, and on which the decision is expressly put, very imperfectly represent the present state of this question, and for the reasons given above I am unable to concur in the reasoning of the learned judge so far as it affects the question now before this court.
Exceptions overruled, with leave to the claimant to answer within one week.