## SOBRINOS DE EZQUIAGA, Libellants,

*v.*

## STEAMSHIP ROCHELIE, ETC., Respondents.

San Juan, Admiralty, No. 1065.

### CONTRACTS IN ADMIRALTY.

Maritime Contract—Libel *in rem.*

    1. A contract in virtue of which libellants were employed as ships'

---

NOTE.- -For a treatment of the whole subject of admiralty jurisdiction of contracts, see note in 66 L.R.A. 193.

As to maritime lien for advances or disbursements by ship's husband, see pages 416 et seq. of note in 70 L.R.A. on the general subject of what contracts will support maritime lien.

VIII. Porto Rico—7.

Sobrinos de Ezquiaga v. The "Rochelie."

agents for the purpose of handling the vessel upon its arrival at a foreign port is not a maritime contract which can be enforced in admiralty by an action *in rem* against the vessel.

Maritime Lien.
 2. The expenses connected with the entry of a vessel at the custom-house gives rise to a maritime lien.

Maritime Lien—Created by Law.
 **3.** Maritime liens are created, by law, not by agreement.

Opinion filed May 24, 1915.

        ————

*Mr. F. H. Dexter* proctor for libellants.

*Mr. Chas. Hartzell* proctor for respondents.

HAMILTON, Judge, delivered the following opinion:

This is a libel *in rem* for damages resulting from an alleged breach of contract by which the owners of the Rochelie are said to have employed the complainants as their agents for the handling of the ship Rochelie at San Juan. Libellants claim that this employment was made March 5, 1915, and that they made a preliminary entrance, giving bond, made public announcement of consignment of the ship to them, and made all preparations for attending to their duties as such. That the ship arrived at San Juan April 3, 1915, and upon going aboard libellants found that the owners had transferred the consignment to other persons. The damages of libellants are for fees for preliminary entrance and bond, fees which would have been earned in connection with the entrance, discharge, and clearance, and other damages not detailed. Respondents except to

the libel on several grounds. The libellants seek to amend their libel by adding an allegation that they entered into the contract upon the credit of the vessel.

The principal point raised by the exceptions relates to the question whether a maritime contract is set up in the libel. This requires consideration of the extent of admiralty jurisdiction in the Federal courts.

1. The origin of admiralty rules was no doubt with the Phœnicians, but the first reduction of these to a code was among the Greeks, and particularly among the Rhodians. The Greeks, especially the Rhodians, had the carrying trade of the Romans, and the Rhodian laws, unfortunately not preserved, prevailed until the Middle Ages. They were improved by the *Consolato del Mar* originating at Barcelona in the fourteenth century, and also were modified by the laws of Oleron of France, of Wisbuy in Sweden, the Hansa laws, and by ordinances of Louis XIV. (1681) in France. It would be an interesting question how far the Code of Barcelona would now obtain in Porto Rico. This was the special Spanish Maritime Code, and therefore prevailed in the Spanish colonies. How far the change of sovereignty from Spain to America would affect the old laws, in view of the declaration in the organic act that the Spanish laws are to be preserved, is a question which may some time arise. It does not, however, arise in the case at bar. There is nothing in the Maritime Code of Barcelona which makes the contract now sued on of any higher dignity or of any different nature from what it is in the general maritime law effective in the American courts.

2. The admiralty law is, in its general principles, probably common to the civilized world, certainly to Western Europe and

America, not, however, through its own force, but because adopted by all nations. The grant of admiralty jurisdiction in the American Constitution is not limited to that known and defined in the English courts at the time of the adoption of that instrument, and includes admiralty in its full vigor and extent.

In England there has been an ebb and flow of admiralty jurisdiction. Richard I. seems to have brought into England the laws of Oleron, in force in his continental dominions, but years afterwards the statutes of Richard II. (13 Rich. II. chap. 3, chap. 5) tended to contract admiralty jurisdiction in favor of the common-law courts. The hostility of the common-law courts reached its acme in the time of Lord Coke, who in 4 Inst. 134, 140, and 12 Coke, 79, would restrict the admiralty to what is done upon the sea, or contracted upon the sea to be done upon the sea. Coke's view, however, has not been generally adopted. Mr. Justice Buller attributes his opposition not only to jealousy, but enmity. Smart v. Wolff, 3 T. R. 348. On the other hand, the decisions of Lord Stowell and others more recently have exalted the admiralty to a very high position.

The leading case on the subject of admiralty jurisdiction is that of De Lovio, decided by Mr. Circuit Justice Story in 1815. This is not only a leading case, but is a monograph on the subject, and may be said to be the foundation of every case which has since been decided. De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776.

It is well recognized that there may be, and in many respects is, a change from time to time in details of admiralty rules. Conditions in America have led to a number of differences between English and American admiralty decisions. This has come about and will continue to arise by a kind of evolution.

Thus, in England admiralty jurisdiction is confined to the ebb and flow of the sea, while in America, since the case of The Eagle, 8 Wall. 15, 19 L. ed. 365, it has been recognized that the great rivers of America substitute navigability for tide. Another difference is that in England jurisdiction as to contracts depends upon whether they were made upon the high seas, while in America jurisdiction relates not to the origin, but to the nature, of the contract. If the contract relates to maritime matters, it is maritime in itself, regardless of the place of execution. The Lottawanna (Rodd v. Heartt) 21 Wall. 558, 22 L. ed. 654. And so even as to repairs to ships in a home port, the rules are different even among the states of the American Union. The Lottawanna, supra.

In some respects the American admiralty law goes further than the English, and not so far as continental admiralty law. The basis is largely in American colonial decisions. Ex parte Easton, 95 U. S. 68, 24 L. ed. 373. In contracts the admiralty jurisdiction depends upon the subject-matter, while in torts locality governs. New England Mut. M. Ins. Co. v. Dunham, 11 Wall. 1, 20 L. ed. 90.

3. This libel sets up what is alleged to be a contract within admiralty jurisdiction. The question, therefore, arises, What are maritime contracts, or, to state it otherwise, what contracts can be enforced in a court of admiralty?

Mr. Circuit Justice Story in the De Lovio Case stated the point as follows:—

"On the whole, I am, without the slightest hesitation, ready to pronounce that the delegation of cognizance of 'all civil cases of admiralty and maritime jurisdiction' to the courts of the United States, comprehends all maritime contracts, torts, and in-

juries. The latter branch is necessarily bounded by locality; the former extends over all contracts (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations) which relate to the navigation, business, or commerce of the sea.

"The next inquiry is, What are properly to be deemed 'maritime contracts?' Happily in this particular there is little room for controversy. All civilians and jurists agree that in this appellation are included, among other things, charter parties, affreightments, marine hypothecations, contracts for maritime service in the building, repairing, supplying, and navigating ships; contracts between part owners of ships; contracts and quasi contracts respecting averages, contributions and jettisons; and what is more material to our present purpose, policies of insurance. S. P. Johnson, J., in Croudson v. Leonard, 4 Cranch, 434, 2 L. ed. 670, Cleirac, Le Guidon, chap. 1, p. 109; Id. chap. 3, p. 124; Id. Jurisd. de la Marine, p. 191; 1 Valin, Comm. 112, 120, etc., 127, etc.; 2 Emer. 319; Godolph. 43; Zouch, 90, 92; Eaton, 69, etc., 295, etc.; Malyne Lex Merc. 303; Id., Collection of Sea Laws, chap. 2, p. 47; Consol. del Mare, chap. 22; 2 Brown, Adm. chap. 4, p. 71; 4 Bl. Com. 67; Stevens v. The Sandwich, 1 Pet. Adm. 233, Fed. Cas. No. 13,409; Targa, Reflex. chap. 1. And in point of fact the admiralty courts of other foreign countries have exercised jurisdiction over policies of insurance, as maritime contracts; and a similar claim has been uniformly asserted on the part of the admiralty of England. 2 Boucher, Consol. del Mare, p. 730; 1 Valin, Comm. 120; 2 Emer. 319; Roccus de Assec. note 80; 2 Brown, Adm. 80; Zouch. 92, 102; Molloy, bk. 2, chap. 7, § 18. There is no more reason why the admiralty should have cognizance of

bottomry instruments, as maritime contracts, than of policies of insurance. Both are executed on land, and both intrinsically respect maritime risks, injuries, and losses."

Maritime contracts have been classified also by Bouvier, who states the matter as follows: "The admiralty jurisdiction has been held not to extend to preliminary contracts, merely leading to the execution of maritime contracts (Andrews v. Essex F. & M. Ins. Co. 3 Mason, 6, Fed. Cas. No. 374; The Tribune, 3 Sumn. 144, Fed. Cas. No. 14,171); nor to trusts, although they may relate to maritime affairs; (Davis v. Child, 2 Ware, 78, Fed. Cas. No. 3,628); nor to enforcing a specific performance of a contract relating to maritime affairs; nor to a contract not maritime in its character; although the consideration for it may be maritime services (Plummer v. Webb, 4 Mason, 380, Fed. Cas. No. 11,233); nor to questions of possession and property between owner and mortgagee (Bogart v. The John Jay, 17 How. 399, 15 L. ed. 95); nor to contracts of affreightment from one port of the Great Lakes to another port in the same state (Allen v. Newberry, 21 How. 244, 16 L. ed. 110). In the following cases (cited in Benedict, Adm. § 214a) actions have been sustained in admiralty: On an insurance policy, The Blackwall, 10 Wall. 1, 19 L. ed. 870; . . . for weighing, inspecting, and measuring cargo, Constantine v. The River Queen, 2 Fed. 731; for coopering cargo, The E. A. Baisley, 13 Fed. 703; for compressing cargo, The Wivanhoe, 26 Fed. 927; for the services of a watchman, The Erinagh, 7 Fed. 235; a diver, The Murphy Tugs, 28 Fed. 429; an average adjuster, Coast Wrecking Co. v. Phœnix Ins. Co. 7 Fed. 236; for the use of a dry dock, The Vidal Sala, 12 Fed. 207; for removing ballast, Roberts v. The Windermere, 2 Fed. 722; for lockage in a

river, Monongahela Nav. Co. v. The Bob Connell, 1 Fed. 218; for wharfage, Ex parte Easton, 95 U. S. 75, 24 L. ed. 375; for insurance premiums, The Daisy Day, 40 Fed. 603; for launching a vessel which has been driven ashore, The Ella, 5 Hughes, 125, 48 Fed. 569; . . . on a contract to supply nets to a fishing vessel, The Hiram R. Dixon, 33 Fed. 297; for the charter of a vessel yet to be built, The Baracoa, 44 Fed. 102; for services as watchman, The Maggie P. 32 Fed. 300; actions to try the title to a ship, Benedict Adm. § 276; but not to enforce a mere equitable title, The Eclipse, 135 U. S. 599, 34 L. ed. 269, 10 Sup. Ct. Rep. 873."

4. The particular contract claimed to be violated in this case is one by which the owners, apparently by mail, constituted the libellants the agents of the Rochelie. The contract is not made an exhibit, and is stated only in general terms. The damages for violation mentioned are fees for making preliminary entrance, furnishing bond therefor, which under the libel were earned, and also the value of fees to which libellants would be entitled for services connected with the entry, discharge, and clearance of the vessel and cargo, which the libellants did not earn because they were prevented from acting in the matter. Was the contract in question a maritime contract which can be enforced in admiralty? This would seem to be what is sometimes spoken of as employment as a ship's husband,—a confidential agent appointed by the owners to conduct and maintain on shore whatever concerns the employment of the ship. On his general employment he is not entitled to a lien on the ship, for, as Judge Pardee tersely expresses it, it is the duty of the husband to keep liens off the ship, and not to put them on. Carmona v. The Esteban Antuano, 31 Fed. 923. "It is well

settled," says Judge Brown, "that a ship's husband or her general agent is not presumptively entitled to any lien upon a vessel for advances made to discharge her obligations. . . . Presumptively, he deals upon the credit of the owners; and he has no lien for his advances unless there is some agreement to that effect, or the circumstances show that such must be deemed to have been the reasonable intent of the parties. When such an agent pays the ship's obligations on the application of the master or the owners, the presumption is that he does so not as a stranger, but as the agent of the ship and her owners, and upon the personal credit of the latter, or of the future business and earning of the ship." Mudgett v. The Raleigh, 32 Fed. 634. It has even been held by Judge Benedict that such an agent has no lien upon the proceeds of certain steamboats of which he was ship's husband, but it may be otherwise as to earnings and other proceeds of the ship while in his hands. White v. Two Hundred Ninety-two Thousand Three Hundred Dollars, 19 Fed. 848.

There are cases in which a claim lies *in personam* in admiralty against the owners where a libel *in rem* would not lie against the vessel; but, as this is a proceeding against the vessel itself, they need not be considered. The vessel is liable *in rem* as if it were a person, because supplies, for instance, are given to it, while it may be the owners live in a distant port and are personally unknown. "The presumption of law is, in the absence of fraud or collusion, that where advances are made to a captain in a foreign port, upon his request, to pay for necessary repairs or supplies to enable his vessel to prosecute her voyage, or to pay harbor dues, or for pilotage, towage, and like services rendered to the vessel, that they are made upon the credit of the vessel as well as upon that of her owners." The Emily Souder,

17 Wall. 666, 21 L. ed. 683. Here the employment was by the foreign owners themselves. It would seem that the employment of a ship's agent or husband as such is not one that carries with it or fixes a lien upon the ship itself.

5. The question, however, does not stop here. The principle of subrogation is applied in admiralty as well as in equity. One paying off a maritime claim against a vessel stands in the shoes of the creditor paid off, and is entitled to the same remedies. And sometimes more. The Menominie, 36 Fed. 197.

The expenses connected with the entry of a vessel at the customhouse gives rise to such maritime liens. The vessel, although she is afloat, cannot do any act until she complies with the customhouse regulations as to bond, fees, and the like. It is under the power to regulate foreign commerce that the Federal government establishes and maintains customhouses and their regulations. Physically, the customhouse is upon the land, but legally contracts connected with entry and clearance are maritime. U. S. Rev. Stat. §§ 3084, 3085, 4197 & 4206, Comp. Stat. 1913, §§ 5787, 5788, 7789, 7797.

To the extent, therefore, that the libel claims a breach of the contract as to customhouse entry and bond, the exception is not well taken.

6. Another exception objects to so much of the libel as claims damages for a breach of an executory contract. It has been decided, however, that "the fact that a contract of a maritime character has never been executed, but remains executory, does not affect the admiralty jurisdiction to award damages for the breach thereof. Boutin v. Rudd, 27 C. C. A. 526, 53 U. S. App. 525, 82 Fed. 685. The question always relates to the nature of the contract, and not to the time of its performance. If dam-

ages would lie *in rem* after performance, damages *in rem* will lie if the libellant is prevented from performing it. But it does not satisfactorily appear that this contract, so far as not executed, was maritime in character. The exception is therefore sustained.

7. The claim for $5,000 damages, but whose exact amount libellant cannot say positively, is improper. It is true that a libel to enforce a lien for supplies need not specify the particular amounts and the evidence by which they are to be proved. Whitlock v. The Thales, 20 How. Pr. 447, Fed. Cas. No. 17,578. But supplies which did or did not reach the vessel are within the knowledge of the captain or owners. Damages whose amount even the libellants cannot say positively are of a different class, and the exceptions must be sustained to this item.

8. The libellants seek to amend their libel by averring that the services rendered were upon the credit of the vessel, and not of the owners. It may be that this is presumed in a foreign port, as in the case at bar, but it must necessarily enter into the case. The claimant objects to the amendment on the ground that it sets out only what is in the mind of the libellant, and does not say that this was also in the mind of the owners; in other words, that their minds did not meet in an agreement for a lien. An agreement, however, is not necessary for a maritime lien. In fact an agreement cannot constitute a maritime lien in the strict sense of the word, for such an agreement would be in the nature of a mortgage rather than a maritime lien. Such a lien requires neither the previous action of the parties nor of a court. "The true meaning of a maritime lien is that it rendered the property liable to the claim without a previous judgment or decree of the court sequestering or condemning it, or establishing the de-

mand as at common law; and . . . the lien so termed was in reality only a privilege to arrest the vessel for the demand, which of itself constituted no encumbrance on the vessel, and became such only by virtue of an actual attachment of the same." The Globe, 2 Blatchf. 427, Fed. Cas. No. 5,483 and The Triumph, 2 Blatchf. 433, note, Fed. Cas. No. 14,182. The maritime services for which a lien is given are "such as are performed in aid of the navigation of the vessel or the ship's company, or in furtherance of her appropriate business and are rendered whilst she is employed afloat upon tide waters." The Harriet, Olcott, 229, Fed. Cas. No. 6,097. A maritime lien in admiralty arises from jurisdiction of the court,—the jurisdiction does not arise from the lien. Boutin v. Rudd, supra. In such case the burden is on the claimant to show that the money was advanced or the services rendered upon the credit of the owner, and not the security of the vessel. Jones v. The Ratler, Taney, 456, Fed. Cas. No. 7,490; The Prospect, 3 Blatchf. 526, Fed. Cas. No. 11,443, and Harney v. The Sydney L. Wright, 5 Hughes, 474, Fed. Cas. No. 6,082a.

It follows, therefore, that the amendment prayed is allowed, and that the exceptions to the libel as so amended are overruled except so far as relate to claims "b" and "c" in paragraph 5 of the libel, with leave to amend within five days.

It is so ordered.