THE NORMAN.*

(*District Court, E. D. Pennsylvania.*   March 15, 1881.)

1. ADMIRALTY— MARITIME LIEN—SUPPLIES FURNISHED ON THE ORDER
   OF CHARTERERS.

   A charterer is not the agent of the owners to charge the vessel for
   supplies, and no lien exists for such supplies furnished upon his order
   and for his benefit at the port where he resides.

2. SAME — AGREEMENT BY CHARTERER TO FURNISH SUPPLIES IN PART
   PAYMENT.

   In such case the fact that the charterer was to furnish supplies in
   part payment is unimportant.

3. SAME—CREDIT GIVEN TO VESSEL IN IGNORANCE OF CHARTER.

   It is immaterial, in such case, that the person furnishing the sup-
   plies trusted the ship, and had no knowledge of the relation in which
   the person ordering the supplies stood to the ship.

4. SAME.

   A coasting steamer was chartered for a foreign voyage from a port
   not her home port.  By the charter the owners reserved the right to
   nominate the captain and engineers, but these officers were to be
   paid by the charterers, who were also to pay all the other expenses of
   victualling, manning, coaling, and running.  In accordance with a
   stipulation of the charter a foreign registry was taken out at the port
   from which she sailed.  The charterer, who resided at this port,
   ordered coal there, which was furnished to the vessel.  *Held*, that
   whether or not the charterer was owner *pro hac vice*, (a question left
   undecided,) no lien existed for the coal, since the charterer was not the
   agent of the owners to charge the vessel.

Libel by the Consolidation Coal Company against the
steam-ship Norman, to recover for 277 tons of coal furnished
to the vessel in New York.  The following facts appeared
from the testimony:

The Norman was a coasting steam-ship, owned by a Mas-
sachusetts corporation, composed of residents of Boston and
Philadelphia, in one of which ports she was enrolled.  In
November, 1878, Murray, Ferris & Co., residing in New York,
chartered her for a voyage to Nassau and other ports.  By
the terms of the charter the charterers agreed to pay all the
expenses of victualling, manning, coaling, and running the
vessel, and all port charges, etc.; the owners reserving the

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

right to nominate the captain, and first and second engineers, who, however, were to be paid by the charterers. The charter also provided that a foreign registry should be taken out by the charterers in New York, which was done. Murray, Ferris & Co. ordered coal from libellants, which was furnished to the vessel at New York. Libellants testified that they furnished the coal on the credit of the vessel; that they were not informed in what relation Murray, Ferris & Co. stood to the vessel, but supposed them to be her agents.

This libel was afterwards filed to recover the price of the coal.

*Thomas J. Diehl* and *J. Warren Coulston*, for libellants.

*John W. Brock* and *Morton P. Henry*, for respondents.

BUTLER, D. J. The ordinary maritime lien for supplies is based upon an implied hypothecation of the ship; and this implication is founded on the ship's necessities and situation,—the need of supplies, and the absence from home, where the owner is without credit. As the master represents the owner, with power to hypothecate, the law implies a hypothecation whenever supplies are purchased by him under such circumstances. He is known everywhere as the owner's confidential agent. His character and position are, therefore, evidence of authority to represent the owner in all matters respecting the ship. His contract for supplies, abroad, raises an implication of lien, because of his power to pledge the ship, and the improbability of obtaining them without. "The master's contract imports a hypothecation." When at home, where the owner is presumed to have credit, and there is, therefore, no necessity for such pledge, none is implied. "To guard against misapprehension," says Mr. Conkling, "it is proper to remark that a lien is never implied from contracts of the *owner in person,* [save in foreign ports?] It is only the contracts which the *master enters into, in his character of master,* that specifically bind the ship or affect it by way of lien, or privilege." Conkling's U. S. Adm. 73–78–80; *St. Iago de Cuba,* 9 Wh. 417.

Were Murray, Ferris & Co. owners *pro hac vice?* If they were, then, the coal in question being purchased by such own-

ers, when the ship was at home, no lien can be implied. Every circumstance necessary to the implication would be wanting- This was decided in *The Golden Gate*, 1 Newb. Adm. 308. In the absence of authority, however, I think it could not be doubted. Did the charter-party constitute Murray, Ferris & Co. such owners? In other words, did it, in effect, transfer the control and possession of the ship to them? They obtained the entire use and enjoyment, and bound themselves to furnish men and supplies, at their own expense. It is not important that the language is "*to pay* for manning, victualing," etc. The effect is as stated. That the parties so understood, is shown by Murray, Ferris & Co.'s purchase of supplies, instead of looking to the general owners for them. The latter stipulated for the privilege of naming the captain and engineers; and the libellants consider this an indication that they retained control of the ship. On the other hand, I think it tends to show an understanding that the ship and her control, were to pass to Murray, Ferris & Co. Otherwise why insert such a provision? If she was not thus to pass, there could be no question of the general owner's right to appoint these officers, as well as the entire crew. The provision was, doubtess, intended to secure to these offices men in whose skill and care the general owners had confidence. I do not, however, deem it necessary to decide this question, of ownership. There is another ground on which the case may, I believe, be rested with entire safety.

If the ship remained in the possession and control of the general owners, (as libellants assert,) no one but her master had authority to represent them. Murray, Ferris & Co. were not their agents, and could not by any act, or contract, bind them or their property. It would not be suggested that they could pledge the ship for supplies. How then can a pledge be implied from their purchase? Their relation to the ship, (if libellants' view be accepted,) was simply that of freighters. The fact that they were to furnish supplies in part payment, is unimportant. And it is equally unimportant that the libellants may have trusted the ship. If they did, it was simply an act of folly, unwarranted and without effect. They

cannot allege imposition; it was their duty to ascertain the purchaser's relation to the ship. They knew he was not the master. This officer had nothing whatever to do with the transaction. He saw the coal coming on board, and knew that Murray, Ferris & Co. procured it, as they were bound to do. The purchase was made exclusively by these people, of their own motion, (so far as appears,) on their own account, and for their own use and benefit. Both the master and engineer say *they* had nothing whatever to do with it. They neither kept a tally of the coal, nor receipted for it,—the engineer saying that when asked to sign a receipt, he referred the individual to Murray, Ferris & Co. Not only was the coal not purchased by the general owners' agent, but it was not even for their use or benefit. It was not important to them whether the ship went on her voyage, or remained in port. The stipulated compensation for her use must have been paid, whether she sailed or remained idle. The charterers could not complain that she was without coal; they were bound to furnish it. In short, the libellants,—if their view of the contract be adopted,—are not creditors of the general owners, sold them nothing, and have no claim whatever on them, or their property in the ship.—*Beinecke* v. *The Secret*, 3 FED. REP. 665, and *Coal Co.* v. *The Secret*, U. S. C. C., S. D. N. Y., December 1, 1879 (not reported), closely resemble the case before me. There, however, the terms of the contract were somewhat different, leaving no room to doubt that the charterers were owners *pro hac vice;* and the decisions might safely have been rested on this ground.

The libel must, therefore, be dismissed, with costs.