HARMONY SETTLEMENT (NACHTRIEB v.). See Case No. 10,003.

HARMONY SOCIETY (LEMIX v.). See Case No. 8,239.

HARNDEN (FISHER v.). See Case No. 4,819.

HARNDEN (ROBERTS v.). See Case No. 11,903.

## Case No. 6,082a.

HARNEY et al. v. The SYDNEY L. WRIGHT.

[5 Hughes, 474.]

District Court, E. D. Virginia. March 12, 1883.

ADMIRALTY—LIEN FOR SUPPLIES—INNOCENT PURCHASER.

[1. The right to proceed against a vessel in rem for supplies is not analogous to liens at common law or by statute, and is not, like them, affected by mere transfer of possession.]

[2. A ship's liability in rem for supplies attaches to her everywhere.]

[3. A ship is not liable in rem for supplies, unless they are of a kind suited to her, and received directly by her at or near the port where they are furnished.]

[4. A vessel has the burden of proving that supplies furnished in a foreign port were not on her credit in rem.]

[5. A vessel in the hands of an innocent purchaser is liable in rem for supplies furnished her in a state where neither her owner, charterer, nor master resided or were known.]

[Cited in The Pirate, 32 Fed. 488.]

By a charter-party, dated on the 23d day of September, 1880, the Delaware Transportation Company of Philadelphia, chartered to John E. Reeside of Washington City, the steamer Sydney L. Wright, to be used on the waters of Albemarle Sound, in North Carolina, on a route from Elizabeth City to Edenton, from the 1st of October, 1880, until the 1st of May, 1881. The price of the hiring was a fixed sum per month; the steamer was to be delivered to Reeside at Norfolk City, and after her service was ended, he was to return and deliver her at Norfolk. The captain, engineer and fireman of the steamer were to be nominated and appointed by the company, and the captain and engineer were to be paid by the company; which was also to furnish the oil and tallow for the engine and the running lights. Reeside was to pay all other expenses, including the board of the entire crew. There were other stipulations not material to the questions involved in this suit. The company contracted to let, hire, deliver, and give the use of the steamer to Reeside. The steamer was in due time delivered to Reeside and put upon the route designated by the charter-party. Reeside had obtained a mail contract from the post-office department; and his principal object in chartering the Wright was to carry the United States mail on that route. The steamer was employed in this service from October, 1880, until early in March, 1881; when, in consequence of some delinquency on the part of Reeside in paying the charter price for the use of her, the Delaware Transportation Company ordered her home; and she left Elizabeth City for Philadelphia, on or about the 9th of March. The Sydney Wright had, for two or three months before then, been supplied with the coal which she used in her engine, by Harney & Co., of Elizabeth City, the libellants in this suit; and the coal had been put on board of her by Harney & Co., from their wharf, which was the one used by the steamer at Elizabeth City; and this coal had been charged to the steamer by Harney & Co., on their books, in the original entries. The coal which was to be used by the Wright for her trip home, and which was taken on board on the 8th of March, was obtained from Harney & Co., and paid for by a draft of her captain, in their favor, on the company in Philadelphia. When the Wright left Elizabeth City, Reeside was there, and Reeside and Harney, one of the libelling firm, looked over together Reeside's accounts with the firm, on the night of the 8th of March; and on this occasion Reeside gave to Harney & Co. his acceptance, payable in Washington, at four days, for $325.80. This amount Reeside admitted to be due; but a receipt was taken for the acceptance, which Harney says was given on account. The acceptance was never paid, and is still due. The principal indebtedness—probably the exclusive indebtedness to Harney & Co.—was for coal for the Sydney Wright. The steamer went direct to her owners in Philadelphia. Capt. Stoddard, one of the firm of Harney & Co., residing in Norfolk, shortly after this time sent a claim

for coal furnished the Wright, amounting to six or seven hundred dollars, to counsel in Philadelphia, for collection. This claim embraced the amount of the unpaid acceptance of Reeside, before mentioned. After some considerable lapse of time, the counsel in Philadelphia informed Capt. Stoddard that the claim was not a good one against the steamer. The claim was duly presented to the Delaware Transportation Company. On the 20th of December, 1881, after the claim had been sent to Philadelphia and returned, as just stated, the Delaware Transportation Company sold the Sydney Wright to Edward J. Galwey, of New York, for $6500, and received the purchase money in cash. Mr. Galwey is the claimant in this cause. Early in February, 1882, the Wright came to Norfolk on her way southward; which was her first appearance in Norfolk after passing through, going home, nearly a year before. The libel in the present suit was thereupon filed and the steamer arrested. She was soon released on stipulation or its equivalent. The libel claims $748.12; but having been taken out in an emergency, it is since found that that amount is greater than what is claimed as due for the coal furnished the Wright at Elizabeth City. The amount really demanded is $575.65. As between Reeside and Harney & Co., the question is, whether $325.80 or $575.65 is the amount due. This question depends upon another one of fact, viz.: whether a wheelbarrow, which was used by Harney & Co. in measuring the coal delivered from their wharf to the steamer, held 230 or 280 pounds. If it held the latter amount, $575.65 is due. If it held only the former amount, then only $325.80 is due; for which sum the acceptance of Reeside was given. The acceptance itself is lost; but a release of it is filed with their libel by Harney & Co.

Sharp & Hughes, for libellant.
Harmanson & Heath, for respondent.

HUGHES, District Judge. As to the question of fact in this case, I think there can be no doubt, from the evidence, that the wheelbarrow referred to held one-eighth of a long ton, or 280 pounds of coal; and, therefore, that the amount due the libellants, and unpaid, is $575.65. The main controverted question in the case is, therefore, the question of law: whether the charterer of a chartered vessel can bind her for necessary supplies in a foreign port. Here, the general owner was a resident of Philadelphia; and the special owner, or charterer, a resident of Washington City. In Elizabeth City, North Carolina, therefore, the Sydney Wright was indisputably a foreign vessel. Neither her general owner, nor her special owner, nor her master, nor any of her principal officers, were residents of North Carolina. Reeside was only occasionally at Elizabeth City; the general owner of the steamer, never. Reeside was a man of no means, or credit, or even of general acquaintance there. The se-

quel developed that he was insolvent; for he did not pay the charter price of the steamer which he was using in the execution of a cash contract; and he did not pay even for a two-months' supply of the coal consumed in propelling the steamer. There was nothing in North Carolina to form the basis of credit to the enterprise in which the boat was engaged, except the steamer herself; and the evidence shows that in point of fact the coal now sued for was charged to the steamer, when and as it was delivered by the barrow load. The general owner, who was a stranger there, had sent her into Albemarle Sound for a seven months' service, in charge of one who was a stranger there and an insolvent; who was without personal credit, and without the right to personal credit; sent her there in disregard of the homely admonition in the Black Book of the Admiralty. which is the horn-book of maritime law (Twiss's Ed. vol. 3, p. 261): "A managing owner of a ship or vessel must beware to whom he lets it."

It would seem that this was a clear case of the liability of the vessel for a necessary supply; but it has been so strenuously denied, in argument at bar, that the admiralty lien attached in this instance, that I feel called upon to go somewhat into elementary principles in dealing with this denial. It seems to me that the denial rests upon a misapprehension of the true nature of an admiralty lien. A tendency exists in the minds of many counsel, of a few text-writers, and I may add, in rare instances, of judges of courts, to confound the admiralty lien with the common law lien, from which it differs both in origin and essential character. Thus assimilating two different things, they naturally infer that the two respective liens must be created in like modes by like agencies; and, looking to the analogies of the common law, are apt to fall into the belief that, in order for the admiralty lien to attach to a vessel, it must be created by the owner or by an authorized agent, by means of some act of one or the other of these persons, more or less formal, positive and solemn; that is to say, in some such manner and through some such instrumentality as that by which a common law lien is created; whereas one of the essential incidents of an admiralty lien is, that it is the vessel herself which acts in its creation, she herself being the contracting party or tort-feasor,—ownership, proprietorship, agency, attorneyship. and the like ideas, being ignored. I use the phrase "admiralty lien," although in truth the word "lien" is not properly an admiralty term. Except in the English and American law of admiralty. the term "lien" can hardly be said to belong to the admiralty vocabulary or nomenclature. At common law there was no lien except in conjunction with the possession of the thing which was the subject of it. A tailor could hold the garment, a livery keeper the horse, the hotel-keeper the baggage of a customer,

until his claim against the owner arising from expenditure upon the object of the lien was satisfied. Statute law has extended the lien so as to allow it in favor of the mechanic, who has built a house for another; in favor of the judgment and execution creditor upon the property of the judgment debtor, real and personal; and in many other instances expressly provided for by statute. It has been only by express statute, however, or through the instrumentality of equity in following the law, that the lien at common law has been extended, in special cases, beyond possession.

Wholly different from all this is the admiralty lien. The creditor of a ship has in general no possession: and the admiralty law, which is a universal law, cannot be enlarged by local statute. What it was in its origin it is now, except so far as it has been gradually improved and enlarged by enlightened judges and jurists. And, therefore, what is in modern times called the admiralty lien has no affinity with the common law right of lien. At common law, the right of the lien-holder was to retain and hold the thing as property. In the admiralty, the right of the creditor of a ship is to find, sue and arrest her, as if she were a living person. At common law the right to sue a person and to hold his property bound by lien, were distinct and different. In admiralty there is but one right; which is, to proceed in rem against a ship as a living person, by name; a right to sue and arrest the ship. This admiralty right to sue and arrest a ship, is simply the same right as that which the creditor had in early times to sue and arrest the corpus of his debtor. There were conditions under which the debtor could be thus dealt with, and conditions under which he could not be thus dealt with; and the same is the case with the admiralty right to proceed in rem against, to sue and arrest, the ship. In early times the debtor could be sued and arrested by virtue of the mere fact that he prima facie owed the debt; but the law has been modified so as to authorize arrest only as against non-residents or debtors about to abscond. The admiralty law has in this respect been somewhat modified; but not to as great an extent as the municipal law has been ameliorated in regard to the arrest of debtors.

It is plain that these last mentioned rights of procedure, which are similar in origin and perfectly analogous, are wholly different from the common and statute law right of lien; and it would have been no more improper under the old law to say that a creditor had a lien on, in the sense of a corporeal property in, the person of his debtor, than it is now to say that a creditor has a corporeal lien upon a ship for his claim, before his service of process in rem upon her, and actual arrest. As in the one case, the right of the creditor was simply to sue and arrest; so in the other case, the right of the creditor is simply to sue and arrest. As in the one case there was no "lien," in the common law meaning of the term, before actual arrest; so in the other case, there is in the eye of the admiralty law, no corporeal, possessory "lien" before actual arrest. An admiralty lawyer of the Continent would, I am sure, be at a loss to comprehend the term "lien" as often used by American writers in respect to a ship, although used in cases in which the right to proceed in rem in admiralty were fully recognized. It is true that there are corporeal and actual hypothecations in admiralty by which liens are established upon ships in the fullest sense of the common law lien; as for instance, in the case of bottomry bonds; but the ordinary right to proceed in rem in admiralty, against a ship, independently of such hypothecations, is of an essentially different character. A ship is a traveller and stranger; and if no ship ever went beyond the horizon in which her owner, her master, or her charterer was personally known to local dealers in ships' supplies, there would never have been such a system of laws as that known over the world as the admiralty code. These laws all relate directly to ships as voyagers, strangers and travellers; and the system has grown up in the interest of commerce; and has been adapted to the convenience and requirements as well of ships themselves, as of the classes who deal with shipping.

One of the fundamental principles of the admiralty law is, that when a ship, this stranger and traveller, comes into a port and is there furnished with the repairs or supplies apparently proper for keeping her afloat in the service of commerce. the ship herself being the contracting party, she may herself be sued as a living person for the things furnished. irrespectively of the condition, as to responsibility, or credit, of any individual on board. whether he be owner, or master, or charterer. It is a fundamental principle of the admiralty law, that the material man who ministers to the needs of a ship, whose papers are regular. may ignore. as the admiralty law itself ignores, the persons in immediate charge of the ship; and. be these persons ever so responsible and well known and wealthy, may sue and hold the ship herself for the price of the services or articles supplied to her. This is a law of commerce. as necessary to the welfare of ships and the prosperity of commerce, as it is just to the persons who minister to the wants of ships. It is true that home or domestic vessels are, in many localities, excepted from these wholesome rules, on the principle that cessante ratione cessat et ipsa lex; but I have no concern with that part of the subject in the case at bar, which respects a foreign vessel.][1]

---

[1] On the subject of liens on domestic vessels, see The Raleigh [Case No. 11,539].

The necessary and just law of commerce. to which I have been referring, is what confers on the creditor of a ship, the right to proceed in rem against her—to sue and arrest her. The body of laws embracing this right is not local. It is universal. It is not an outgrowth of the English or American laws of navigation, or of any local system of jurisprudence whatever. It is as old as the most primitive navigation known to history, and as ancient as any code on earth. It has force everywhere, and follows a ship around the globe, with lengthening chain, into every port known to commerce which she may enter. This right to sue and arrest a ship is as tenacious as the law conferring it is universal. If supplies are furnished her to-day in Norfolk, and she sails out of port to-morrow to circumnavigate the earth, this liability to suit and arrest will follow her everywhere though she be absent for years and traverse a course as long as the belt of the equator. Through every moment of her absence and at every point in her journey she will continue liable to the right of her Norfolk creditor, to sue and arrest her for his demand. How incongruous, how preposterous, therefore, is the idea of lien in the corporeal and possessory sense of the common law, applied to such a right! How vain is the endeavor, how gross the mistake, of assimilating this right, to the county-court idea of a lien, registered in a local deed-book!

As to the conditions under which the right to sue and arrest a vessel arises, on the presumption that credit for supplies is given to her, it is obvious, first, that the ship must herself be the immediate and direct recipient of the supplies or repairs furnished to her; that is to say, she must be in or near the port where they are furnished, and must receive directly herself, for her own use, the things furnished. It would be too great a stretch of the privilege conferred upon the creditor by the admiralty law, to allow him, on the legal presumption that credit was given the ship, to sue and arrest a vessel to which he has sent supplies at a distance of hundreds of miles, on her own credit. There may be no such vessel. She may not be at the port to which the supplies are sent. She may not be in need of them. They may never reach her. In such a case, obviously, the convenience and requirements of commerce do not demand, nor would they be subserved, by such a stretch of the law of credit in admiralty, as to embrace cases in which so many contingencies may intervene to intercept supplies from the ship.

In the next place, the repairs or supplies should be apparently proper and necessary for the vessel in the condition in which she may be, when receiving them; and they must be furnished, in good faith, for the use and benefit of the vessel.

As a third requisite, it is sometimes contended, that the supplies must be furnished specifically and distinctly on the credit of the vessel. Whatever may be the law on this head, as to a domestic vessel, I do not think it applies to a stranger and foreigner. It is the policy of the admiralty law to discourage such a doctrine as to a foreign ship, and not to listen to evidence tending to show that supplies have been furnished to such a vessel on any other than her own credit. To permit such an enquiry, to allow a question to arise whether the ship or some person were credited by the material man who ministered to her wants, would be of most pernicious influence upon dealings between ships and material men; and, by encouraging litigation on such questions, would create apprehensions of suits in commercial communities which would seriously embarrass foreign vessels coming into port for supplies. The presumption of law is, that supplies proper for a foreign ship have been furnished on her own credit; and the burden of proof is thrown upon respondents to show positively to the contrary. The exception sometimes set up to this general rule, of cases in which, though the vessel be foreign, and her owner also foreign, yet her charterer lives and conducts business in port, and has full control of the vessel, and is known by the material man to have this control and to be responsible for the vessel's contracts, will be adverted to in the sequel.

The authorities supporting the principles announced in what has been said above, are numerous and conclusive. I shall cite, however, only such as bear directly on the case at bar. In the case of The City of New York [Case No. 2,758], Mr. Justice Nelson held, that the agent of the charterers of a vessel could bind her for supplies, even though the libellants knew that the vessel was under charter. In the case of Thomas v. Osborn, 19 How. [60 U. S.] 22 et seq., the United States supreme court held, that the master, though charterer, could bind the ship. The reasoning on page 30, that the owner could protect himself by stipulations, is worthy of special note. In Hill v. The Golden Gate [Case No. 6,491], Mr. Justice Catron and Judge Treat recognized the right of a charterer to bind the vessel. So, in the same case when in the court below [Id. 6,492]. So in the case of Flaherty v. Doane [Id. 4,849], where it is said, "Admiralty liens depend more on services rendered the ship than on any question of agency." In the case of The Patapsco, 13 Wall. [80 U. S.] 329, a libel for coal furnished on the order of the charterer was sustained. In the case of The Phoebe [Case No. 11,064], it was held, that the master, though charterer, could, on a contract of affreightment, bind the ship, and that "the owner has his remedy against the charterer." In the case of The Neversink [Id. 10,133], Mr. Justice Nelson held a vessel liable for supplies of coal furnished apparently at the master's orders. The ship is liable for supplies furnished in a foreign port, though

the owner is there and ordered them in person, if he was non-resident and they were furnished on the ship's credit. The Kalorrama, 10 Wall. [77 U. S.] 204. In the case of The Freeman, 18 How. [59 U. S.] 182, it was held that the charterer could bind the vessel for the performance of contracts of affreightment. If so, then a fortiori can he bind her for those supplies without which the contract can not be performed. The power of a master to bind the vessel and her owners even though chartered, is recognized in Bass v. O'Brien, 12 Gray, 477; and Arthur v. The Cassius [Case No. 564]. See, also, The Nestor [Id. 10,126]; The Sarah Star [Id. 12,354]; and The Monsoon [Id. 9,716]; also Mr. Etting's Essay, 21 Am. Law Reg. 2, in note; The India, 14 Fed. 476; and The S. M. Whipple, Id. 354. The case of The India is in all material respects precisely like the case at bar. That of the Whipple is like in its principles. As to whether the coal furnished to the Wright was necessary, the fact that a vessel is in a foreign port, itself creates the presumption of necessity as to supplies furnished. See The Washington Irving [Case No. 17,244]; The Eclipse [Id. 4,268]. And the fact that the supplies are ordered by the master in a foreign port is sufficient proof of the existence of a necessity for the supplies and for credit, in the absence of fraud or collusion. See The Grapeshot, 9 Wall. [76 U. S.] 136; The Guy (a case much like this at bar) Id. 758; The Lulu, 10 Wall. [77 U. S.] 192; The Emily Souder (see paragraph 3 of syllabus), 17 Wall. [84 U. S.] 666; Mr. Etting's Second Essay, 21 Am. Law Reg. 85, notes 2, 4; The James Guy [Case No. 7,195], affirmed 9 Wall. [76 U. S.] 758; The Plymouth Rock [Case No. 11,235], affirmed [Id. 11,237]; and The Metropolis [Id. 9,503]. Nor does the presence of the owner of a vessel in a foreign port, where supplies are ordered by himself, or there being ordered by himself, if he be non-resident, defeat the lien; for this is abundantly shown by the cases supra.

The respondent relies upon the cases of Beinecke v. The Secret, 3 Fed. 665, heard at the same time with Maxwell v. The Secret, Id.; and The Norman, 6 Fed. 406. As to Beinecke's libel, it was for supplies furnished to and shipped by her charterers in New York for the steamer at Jacksonville, Florida, between which port and certain foreign ports the Secret was running. The charterers were residents in New York; the supplies were delivered and charged to them. The Secret was at the time at Jacksonville, or on the route on which she was running. All the facts of the case were in combat with the presumption of law that the supplies were furnished on the credit of the vessel. The Secret was not only not in port, but a thousand miles off; the supplies were, of course, not put upon board of her by the libellant. The vessel was not, there-

fore, in port under conditions in which it is the policy of the law to encourage the supplying of the needs of foreign vessels; and I think the decision of the court, in this case, against the libellant, was in entire harmony with the authorities which I have cited. The claim of Maxwell against the same vessel was of the same character. The supplies were furnished at the order of charterers resident in New York, and were charged to them. When a part of them were furnished, the steamer, it is true, was at New York, but she was about to sail for Jacksonville. She was allowed to sail while the goods were not yet paid for. The bill for the goods was not sent to the charterers until several days after the steamer had sailed. The facts of the case were all in the teeth of the presumption of law, that the supplies were furnished on the credit of the ship; and placed the case beyond the reason and policy of the law encouraging the furnishing of needful supplies to foreign ships. The claim of Maxwell was in principle identical with that of Beinecke; and the decision of the court was in harmony with the general principle of admiralty, presuming credit to be given the ship, in proper cases for such a presumption.

The case of The Norman [supra] was not so plainly an exceptional one to the general rule. The supplies were furnished in New York, on the order of charterers resident in New York, to a vessel, owned indeed in Boston, but registered in New York. The vessel was running between New York and Nassau; and was in the possession, use and control of the New York charterers; who, if not technically, were actually her owners pro hac vice. The ship was thus practically divested of the foreign character. She was virtually a domestic vessel, owned pro hac vice by home charterers. These special facts strongly conflict with the general presumption of law, that supplies furnished to a foreign ship, in a port where owners, charterers and master are all strangers, are furnished on the credit of the ship; and seem to take this case out of the general rule. I am not disposed to question the propriety of the decision rendered in it; especially as there may have been facts unreported that may have influenced it largely; but I regret that it was not rested on the leading facts to which I have alluded. Where supplies are furnished to a ship which is virtually a domestic ship, on the order of owners or charterers who are residents of the port where they are furnished, and who are well known to dealers in ships' supplies in that port, it may well appear that the presumption of law, that they were furnished on the credit of the ship, is overthrown; and I think a court may well say to a libellant, "you shall not be allowed to manufacture a presumption of law not existing in your case, by charging supplies to a ship, and affecting ignorance of facts which be-

lie the presumption." Exceptions like these, not only do not discredit a great and sacred principle, but really sustain it. I do not think these last cases named are similar in their essential features to the one at bar, or conflict with the general principle of the liability of a chartered vessel for supplies furnished in a port in which she herself, her charterer, and her owners, are all strangers. I will decree accordingly.

[The opinion and statement in this case are published from the original MS. as filed in the clerk's office.]