## THE VIDAL SALA.

*(District Court, S. D. Georgia. April 24, 1882.)*

### ADMIRALTY—JURISDICTION—DOCKING CONTRACT.

A contract which stipulates with the libellants that "their charge for attending to carrying out of docking, with crew's assistance, raising steamer, clearing and keeping dock clear of water to an extent necessary for working at the shaft while she is undergoing repairs, covering, releasing, rent, and all other expenses which may be incurred in carrying out of such repairs, to be $2,500," to be paid on the satisfactory termination of the contract, is purely maritime, —"a contract concerning the sea," over which admiralty has jurisdiction.

In Admiralty. Libel *in rem* for use of dry-dock.

*Chisholm & Erwin,* for libellants.

*Mr. Mercer,* for respondent.

ERSKINE, D. J. The libel is based upon a written contract made in the city of Savannah, between S. Fatman, as agent of the Spanish steamer Vidal Sala, then lying in the port of Charleston, South Carolina, disabled, having her propeller shaft broken, and James K. Clarke & Co., libellants. The following is a copy of the contract:

"SAVANNAH, December 31, 1881.

"*James K. Clarke & Co., City—Dear Sirs:* In confirmation of our verbal agreement, I hereby repeat that it is mutually understood and agreed between your good selves, as owners of the dry-dock, and myself, as agent of the Spanish steamer Vidal Sala, that the said steamer will enter your dry-dock upon her arrival here, for the purpose of attending to certain repairs to her machinery, and that you will have the dry-dock in readiness to receive her on Tuesday next, the second prox., unless prevented by some unforeseen accidents or impediments.

"Your charge for attending to and carrying out of docking, with crew's assistance, raising steamer, clearing and keeping dock clear of water to an extent necessary for the working at the shaft while the steamer is undergoing repairs, covering, releasing, rent, and all other expenses which may be incurred in the carrying out of such repairs, to be $2,500, say twenty-five hundred dollars, such sum to be paid to you (libellants) by me, (Fatman,) for account of whom it may concern, upon the satisfactory termination of the contract. It is understood that the dry-dock and its owners are not to be held liable for any accident that may happen through the giving way, breaking, or other

accidents that may occur, over which they have no control. It is further understood and agreed that should the said Vidal Sala be lost before entering your dock, this contract shall be considered null and void.  Please acknowledge the above and oblige, dear sirs, yours truly,                S. FATMAN.

"Received just now following telegram: 'Weather permitting, Vidal Sala leaves here Monday, arriving Tuesday, to enter dry-dock, of which please take note.'"

As the question now presented for determination arises on exceptions to the jurisdiction of the court, because, as is alleged, this contract for the use or rent of libellants' dry-dock is not a contract maritime in its nature, and consequently not cognizable in the admiralty, therefore nothing more than an outline of the libel and its amendment need be given.  The libellants say that they are engaged in the business of docking vessels needing repairs; that they are the owners of said dry-dock, and that it is located on Hutchinson's island, opposite the city of Savannah, and within the ebb and flow of the tide; that, assisted by the crew of the said steamer Vidal Sala, they placed her in their dry-dock, and fixed her there preparatory to the repairs which were to be made on her, and when made they removed her from the dock; that their suit is founded upon a contract civil and maritime; that the stipulated sum of $2,500 is but a just and reasonable compensation for their labor, skill, and use of their dry-dock, its apparatus and appliances; that having fully and faithfully performed the contract, in all respects, according to its terms, they demanded the $2,500, no part of which has yet been paid; that the said dockage was furnished on the credit of the said foreign steamer, her tackle, etc., and that the premises are true, and within the jurisdiction of this court.

Where a party seeks the aid of a court of admiralty to enforce a special contract, the entire contract must be essentially maritime in its qualities and attributes.  It is not sufficient ground for admiralty jurisdiction that the contract involves some elements of a maritime nature: the substance of the whole contract must be maritime.  And a maritime privilege or lien, imparting, as it does, a tacit hypothecation of the subject of it, is a strict right, and cannot be extended by construction, analogy, or inference.  4 Mas. 330, 19 How. 22.

The learned proctor for the claimant argued to show that the contract, in its totality, did not contain those ingredients which are necessary to constitute it a maritime contract, and that none of the acts done by the libellants were maritime services and gave them no lien on the vessel.  In support of his views he cited and collated numerous cases.  Those most prominently relied on are *Bradley* v. *Bolles,*

Abb. Adm. 569, and *Ransom* v. *Mayo*, 3 Blatchf. 70. In the first case it was ruled that work done upon a vessel in a dry-dock, in scraping the mud and barnacles from her bottom, preparatory to coppering her, is not of a maritime character, the court remarking that the services were mere shore work and menial, requiring no mechanical skill, and did not relate to repairs, or any betterment attached to her in promoting her safety or navigation, but were only preliminary to the reparation intended to be put upon her. In the other case a libel *in personam* was brought against a ship-builder to recover for damage done to a vessel in consequence of her having broken her fastenings upon the ways, as she was being hauled up to be repaired in the ship-yard. The district court dismissed the libel, on the ground that the duty of the respondent did not arise out of a maritime contract; that the contract was made upon land, and related to service to be performed upon land; and that, therefore, the case did not fall within the admiralty jurisdiction. On appeal to the circuit court, Mr. Justice Nelson concurred with the district court.

Three years later the case of *Wertman* v. *Griffith*, Id. 560, came also, on appeal, before the same eminent judge. It was a libel *in personam* to recover compensation for services rendered by libellant, who was the owner of a ship-yard, together with certain apparatus, consisting of a railway cradle, etc., used for hauling up vessels out of the water and sustaining them while they were being repaired. Objections were raised to the jurisdiction, upon the ground that the agreement for the service rendered must be regarded simply as a hiring of the yard and apparatus. But the court upheld the jurisdiction, and decided that the owner of the railway cradle could sue in the admiralty, although the repairs were made by other parties. Said the court: "The service requires skill and experience in the business, and is essentail to the process of repair. I do not go into the question whether this is a contract made or service rendered on land or on water. It undoubtedly partakes of both characters. But I am free to confess I have not much respect for this and other like distinctions that have sometimes been resorted to for the purpose of ascertaining when the admiralty has and when it has not jurisdiction. The nature and character of the contract and the service have always appeared to me to be the sounder guide for determining the question. Although a distinction may be made between this case, in the aspect presented, and the case where the ship-master is employed to make the repairs, I am inclined to think that it is not a substantial one, and that to

adopt it would be yielding to a refinement which I am always reluctant to incorporate into judicial proceedings. A distinction, to be practical, should be one of substance, and one which strikes the common sense as founded in reason and justice." I do not see clearly how these cases are to be reconciled.

In the case of *The Bark Alexander McNeil,* Savannah *News,* November 26, 1874, this court held that wharfage is a maritime lien, and may be enforced in the admiralty, the court observing that "the owner and master of the ship, or the ship herself, or the proceeds arising from her sale, may be proceeded against in the admiralty to enforce the payment of wharfage, dockage, or pierage." Whatever doubt arose in regard to the correctness of this ruling is now put at rest by the supreme court of the United States in the case *Ex parte Easton,* 95 U. S. 68, where it is expressly decided that claims for wharfage are cognizable in the admiralty; and Mr. Justice Clifford, in giving the opinion of the court, said:

"These remarks are sufficient to show that wharves, piers, or landing places are well-nigh as essential to commerce as ships and vessels, and are abundantly sufficient to demonstrate that the contract for wharfage is a maritime contract, for which, if the vessel or water-craft is a foreign one, or belongs to a part of a state other than that where the wharf is situated, a maritime lien arises against the ship or vessel in favor of the proprietor of the wharf. Water-crafts of all kinds necessarily lie at a wharf when loading and unloading; and Mr. Benedict says that the pecuniary charge for the use of the dock or wharf is called wharfage or dockage, and that it is the subject of admiralty jurisdiction. * * * Such erections (wharves) are indispensably necessary for the safety and convenience of commerce and navigation, and those who take berth along-side of them, to secure those objects, derive great benefit from their use."

If wharves are essential to commerce, navigation, and for the preservation of ships and other vessels, then it must follow, by parity of principle, that quays, marine piers, and docks, whether it be the common or slip-dock, or the wet-dock, where vessels are protected from the influence of the tide by closing the dock gates, not during the flowing but during the ebbing of the tide, thus keeping the vessel afloat at low water, are equally indispensable for like purposes and uses, and entitled to like maritime privileges or liens.

Opposite the city of Savannah, forming the left bank of the Savannah river, lies Hutchinson island, and there the libellants allege their dock is located. No description of it having been presented to the court, I shall endeavor to give a sketch of a dry or graving dock, presuming that these docks are similar to each other.

It is a water-tight chamber, fitted with timber or iron gates, which are shut against the tide after a vessel has entered for the purpose of being inspected or repaired. When admitted she is placed on certain blocks in the center of the dock, and as the tide recedes the water is let out until it is level with low water. And if it becomes necessary for the examination or repairing, the water below low tide is generally pumped out by steam, and the vessel must be continually shored up, as the process of emptying is carried on, that she may be kept on an even keel and prevented from straining or careening. Thus it may be seen that the work of the dock master necessitates expenditure of money (exclusive of that invested in the dry-dock proper) for apparatus and implements, and also requires mechanical skill and great care in conducting the business of docking. And notwithstanding a vessel, during inspection or repairment, may rest high and dry on the bottom of the dock, and indeed ships and other watercraft are frequently thus left alongside a wharf on the recession of the tide; yet, when a vessel enters a dry or graving dock she floats in, and when she leaves it she floats out.

Recurring to the case of *Bradley* v. *Bolles, supra,* where, as already observed, it was held that a person hired to scrape the bottom of a foreign vessel in a dry-dock before coppering, could not sue in the admiralty, the service being menial and mere shore work, requiring no mechanical skill, this decision, to my mind, divaricates from those rules and principles which govern the jurisdiction of the admiralty. But, be that as it may, the point ruled there is but approximative to the question for determination in the case at bar. *Choate,* J., in the recent case of *The Windermere,* 2 FED. REP. 722, held that the libellant had a maritime lien for services in removing ballast from a foreign vessel, in the port of New York, for the purpose of putting her in condition to receive cargo. As to the case of *Ransom* v. *Mayo, supra,* cited by respondent, it was virtually overruled by *Wertman* v. *Griffith, supra.*

Whether a contract is maritime or not maritime depends, not on the place where it was made, but on the *subject-matter* of the contract. Some maritime contracts—those of marine insurance, bottomry, respondentia, and affreightment—are not only made on the land, but are performed on the land; the first three by payment of the money, the last by delivery of the goods and payment of the freight. *Ins. Co.* v. *Dunham,* 11 Wall. 1.

Fairly interpreting the entire contract, is it maritime in its nature? *Ex tota materia emergat resolutio.* It stipulates with the libellants

that their "charge for attending to carrying out of docking, with crew's assistance, raising steamer, clearing and keeping dock clear of water to an extent necessary for working at the shaft while she is undergoing repairs, covering, releasing, rent, and all other expenses which may be incurred in carrying out of such repairs, to be $2,500," to be paid on the satisfactory termination of the contract.

The meaning of the term "docking," as employed here, and as it is ordinarily understood by mariners and dockmen, would not be satisfied by the mere entrance of the steamer into, and her departure from, the dock; many and various additional acts would be necessary to supply its well-established signification.

From the general scope of the language used in the contract in hand, it will be seen that its special and implied conditions make it, for example, the duty of the libellants when the steamer gets within the dock to place her in position, and as water flows out during the reflux of the tide, or is expelled by pumping, to keep her constantly shored up, blocked and braced, and the dock as free from water as may be necessary for examining and repairing her,. and to guard her from becoming hogged, strained, blown over by the wind, or in anywise injured. And, when the reparation is completed, to safely remove her from the dock.

No authority has been presented, nor case referred to, neither has any valid reason been given why the various acts alleged to have been done in the premises by the libellants under the terms of the contract, or by reasonable intendment of it, should not fall within the category of maritime service. The employment cast upon the libellants by the contract required, *inter alia*, care and mechanical and nautical skill in its performance, and the work done must be regarded as a betterment of the steamer herself, and as appertaining to marine commerce and navigation, and absolutely essential to render her seaworthy and enable her to prosecute her voyage. I think the whole contract is purely maritime—"a contract concerning the sea." So far as my researches and information extend, this is the first time that this precise question has come before this court for decision; therefore it is to me *primæ impressionis*. The maxim of the law is to amplify its remedies, and, without usurping jurisdiction, to apply its rules to the advancement of substantial justice; and without doubt or hesitancy I pronounce for the jurisdiction and overrule the exceptions.