Tomlinson Fleet Corporation v. Commissioner.
Tomlinson Fleet Corp. v. Commissioner
Docket No. 5491-64.
United States Tax Court
T.C. Memo 1966-13; 1966 Tax Ct. Memo LEXIS 268; 25 T.C.M. (CCH) 59; T.C.M. (RIA) 66013; January 17, 1966, Decided *268 Petitioner owns and operates cargo vessels. Pursuant to a policy to sell uneconomical vessels, it sold two and received an offer for a third vessel, Sumatra, from a Canadian corporation, a foreign buyer, in 1960. The delivery of a registered vessel to a foreign buyer is subject to regulations and approval of the Maritime Administration, but such regulations do not apply to the delivery of a vessel to a domestic buyer. Petitioner sold and delivered the Sumatra in December 1960 to a Delaware corporation, organized in December, Tower Transit Corporation. Tower subsequently sold the vessel to the Canadian corporation, carried on negotiations with Maritime Administration, became the resident agent of the Canadian buyer, and is still in existence. 1. Held: Tower was organized for business purposes, engaged in business activities, and was not a sham. Tower must be recognized as a separate corporate entity having a tax identity separate from petitioner. Tower did not act as an agent of petitioner when it sold and delivered the Sumatra to the Canadian buyer. Moline Properties, Inc. v. Commissioner, 319 U.S. 436. 2. Held, further: Petitioner made a bona fide sale of Sumatra *269 to Tower and sustained a loss in 1960 within section 165(a). Scott H. Elder, 1208 Terminal Tower, Cleveland, Ohio, for the petitioner. Joseph T. Kane, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax for 1957 in the amount of $73,748.87. The issue is whether Tower Transit Corporation is a corporation having a tax identity separate from petitioner, and whether in 1960 petitioner sold a vessel to Tower and sustained a loss in 1960, which is deductible under section 165(a). *270 Findings of Fact The stipulated facts are so found and are incorporated herein by reference. Petitioner filed its returns for 1957 and 1960 with the district director of internal revenue in Cleveland, Ohio. Petitioner keeps its books and prepares its returns on the basis of a calendar year, under a cash accounting method. Petitioner was organized in 1927 under the laws of Delaware. Its principal office is at 2900 Terminal Tower in Cleveland, Ohio. It is engaged in the business of operating bulk cargo freight vessels in trade and commerce on the Great Lakes. At the beginning of 1960, it owned 10 freight vessels licensed and enrolled under the laws of the United States. The officers of petitioner in 1960 were: E. C. Davidson, president; H. J. Lester, vice-president; H. L. Hays, secretary; and Alfred Alexander, treasurer. Davidson owned 10.94 percent of petitioner's capital stock; Lester owned 5 percent; and Alexander owned 3.4 percent. Lester (now deceased) was the vessel manager. Petitioner realized taxable income from its operations in 1957, but for each of the years 1958, 1959, and 1960, petitioner had a net operating loss. Petitioner reported in its 1960 return a net operating *271 loss of $455,573.43, which it deducted from its 1957 income as a net operating loss carryback. The respondent, upon his audit of the return for 1960, determined that certain deductions were not allowable, thereby reducing petitioner's net operating loss for 1960 to $271,146.25, which he allowed as a deduction from petitioner's 1957 income as a net operating loss carryback from 1960; but he denied a deduction for 1957 of $184,427.18 for a claimed net operating loss carryback from 1960. With respect to this determination, petitioner contests only the denial of a loss deduction for 1960 in the amount of $141,824.75. In its return for 1960, petitioner deducted $141,824.75 as a loss resulting from the sale on December 27, 1960, to Tower Transit Corporation, of one of its vessels, the Sumatra, for $37,000, which then had an adjusted cost basis of $178,824.75. Respondent denied this deduction, thereby reducing in that amount petitioner's net operating loss for 1960 and petitioner's net operating loss carryback to 1957. In the statutory deficiency notice, the following explanation of respondent's determination is stated: (d) The loss claimed on line 8 of your income tax return, Form 1120, *272 for the taxable year ended December 31, 1960 in the amount of $184,524.00 includes a loss on the sale of the Steamer Sumatra in the amount of $141,824.75 which is held to be unallowable on the grounds that the loss was not in fact sustained in the year 1960. The Sumatra is a bulk cargo vessel that was built in 1897. Petitioner acquired it in 1929. It has a cargo capacity of 5,000 tons and was the smallest vessel in petitioner's fleet. Other vessels in petitioner's fleet have a cargo capacity of 10,000 tons or more. The Sumatra is a self-unloader; i.e., it carries a moving belt which is its own unloading equipment. Some of the other bulk cargo vessels in petitioner's fleet are straightdecker vessels, which are unloaded at the dock by a hellet, and are not self-unloaders. When it was in operation, the Sumatra carried cargoes of coal, sand, or crushed stone. Petitioner laid up, dismantled, and decommissioned the Sumatra in the fall of 1958 because it was uneconomical and unprofitable to operate due to its small size and cargo capacity. The Sumatra was laid up at Fairport, Ohio. During the rest of 1958, and during 1959 and 1960 the Sumatra was laid up and out of commission. Petitioner *273 had two other vessels which performed the same service, the Tomlinson and the Sylvania, which had twice the cargo capacity of the Sumatra and recently had been converted to be self-unloading vessels. During 1960, prior to November 16, petitioner sold out of its fleet the Rufus P. Ranney, a straight-decker bulk cargo vessel, and the Cuyler Adams. The Ranney was sold on July 29, 1960, to an American buyer; and the Adams was sold on September 23, 1960, for scrap, to a Canadian corporation. Petitioner acquired the Ranney in 1908, and the Adams, in 1904. On November 16, 1960, petitioner's board of directors duly adopted the following resolution: RESOLVED, that the acts of the officers of the corporation in selling for scrap the steamer Cuyler Adams for $37,000 net, and the steamer Rufus P. Ranney for $40,000 less commission of $2,000, $38,000 net, be and they hereby are ratified and approved. RESOLVED FURTHER, that the officers of the corporation be and they hereby are authorized to sell the steamer Sumatra upon such terms and conditions as they may deem best and to execute any and all documents necessary to effect the transfers of title. It is stipulated that petitioner sold the *274 Ranney for $40,000, at a loss of $17,750.33; and sold the Adams for $37,000, at a loss of $24,948.92. Petitioner's earnings and losses in the years 1957 through 1964, as reported in its returns and before adjustments by the respondent, were as follows: Year
Profit
Loss
1957
$439,938.68
0
1958
0
$623,000
1959
0
209,062
1960
0
455,573
1961
0
573,563
1962
0
331,900
1963
0
114,010
1964
0
107,963
In 1960, petitioner operated only two self-unloader vessels out of its entire fleet, but not concurrently, so that throughout 1960, it carried on its operations using only one vessel at a time. At the present time, petitioner's fleet consists of only five vessels, of which only two are in operation. In 1960, the business of petitioner required the use of larger vessels, of the self-unloader type, and petitioner adopted a policy of disposing of its smaller, uneconomical vessels. Since 1960, petitioner has followed the policy of operating two vessels each year, and its other vessels have been laid up at Lake Erie ports; one has been under a charter. Petitioner gave consideration to selling the Sumatra in the early part of 1960 and there were discussions *275 with possibly interested parties. It cost as much to operate the Sumatra, which carried only 5,000 tons, as a vessel with greater cargo capacity; therefore, it was not an economical vessel to operate. Early in 1960, petitioner discussed with a syndicate the sale of the vessel at $150,000. A purchase agreement was drawn up by petitioner's attorneys, but the syndicate was unable to raise the money. Early in 1960, petitioner also received inquiries from two Canadian corporations, but neither made an offer to purchase the Sumatra; and some foreign and domestic dealers in scrap indicated an interest in buying the Sumatra for scrap but no firm offers were made. The market for scrap was low in 1960. Petitioner's directors believed, upon making inquiries, that if the vessel were to be sold for scrap, the purchase price would be not more than $28,000 or $30,000. The only firm and substantial offer to purchase the Sumatra was made by a Canadian corporation, R. E. Law Crushed Stone, Limited, located in Port Colborne, Ontario, Canada (hereinafter referred to as Stone), which offered $40,000. H. J. Lester reported this offer to the meeting of the board of directors on November 16, 1960. Thereafter *276 negotiations were concluded and an agreement of sale was drawn up. On or before December 9, 1960, petitioner orally accepted Stone's offer, and on December 9, 1960, Stone made a payment of $15,000, which was the earnest money under the agreement. The payment was made in the following way: Stone obtained a draft of the Imperial Bank of Canada in Port Colborne, No. A 568029, dated December 9, 1960, payable by Chase Manhattan Bank, its correspondent bank in New York City "to the order of Tomlinson Fleet Corp.", in the amount of $15,000 United States funds. Under date of December 13, 1960, the receipt of this payment was entered on petitioner's books as the payment of 37.5 percent of the purchase price of the Sumatra, $40,000, under the sale agreement of December 12, 1960. The agreement of sale was duly executed by the respective officers of petitioner and Stone. It is incorporated herein by reference. Under sections 9, 37, and 41 of the United States Shipping Act of 1916, as amended (46 U.S.C.A. sections 808, 835, and 839), approval must be obtained by the United States *277 Maritime Administration (hereinafter called Maritime) for the transfer and delivery of a United States vessel to a foreign purchaser. On December 9, 1960, petitioner executed an Application to the United States Maritime Administration, Department of Commerce, Form MA-29, for the approval of the transfer and delivery of the Sumatra to foreign registry, to R. E. Law Crushed Stone, Limited, a corporation organized under the laws of the Province of Ontario. This application was received by the Foreign Transfer Branch of the Ship Transfer Division of Maritime on December 13, 1960. The sale agreement between petitioner and Stone dated December 12, 1960, provided in substance, inter alia: That Stone agreed to pay petitioner $40,000 for the Sumatra, of which $15,000 was paid at the time of the execution of the contract, and the balance of $25,000 would be paid at the time of the delivery and conveyance of the vessel. That petitioner would obtain Maritime's approval of the sale and delivery of the vessel under the official Form MA-29. That if the application was not approved, the payment of $15,000 would be returned to Stone and the parties would be without any obligation, one to the other. *278 That petitioner's conveyance of the Sumatra to Stone would be by bill of sale on United States Customs Form 1342, at 3 P.M. o'clock, Eastern Standard Time, on the first day following the receipt of the approval of the sale by Maritime at 2900 Terminal Tower, Cleveland, and that at the same time Stone would accept the physical delivery of the Sumatra by giving petitioner a duly executed receipt in an agreed form. That Stone expected to use the Sumatra, registered under either the Canadian flag or a British Commonwealth flag, in the transportation business, but if Stone should be prevented from so doing, Stone would demolish and scrap the vessel. That Stone agreed to purchase the Sumatra "as-is and where-is afloat." A factor which entered into petitioner's acceptance of Stone's offer to purchase the Sumatra was petitioner's desire to make a sale of the vessel in 1960. But a sale of the Sumatra also was in accord with the policy which petitioner had previously adopted, to dispose of its smaller vessels which were not profitable or economical to operate. Petitioner wanted to obtain Maritime's approval of and make delivery of the vessel in 1960 to Stone. Petitioner was fully aware of *279 the fact that the resulting loss from the sale could be carried back as part of an expected net operating loss for 1960 against the income of the taxable year 1957, the last year in which petitioner realized net income from its operations, but tax conservation was not petitioner's sole motive in selling the vessel to Stone, since petitioner had previously adopted the policy of attempting to dispose of its smaller and uneconomical vessels and already had sold two of them. By virtue of the Shipping Act of 1916, it is unlawful to sell, mortgage, deliver, or in any manner transfer to any person not a citizen of the United States any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States without the prior approval of the Secretary of Commerce through Maritime. The penalty for violation of this provision of the Shipping Act is forfeiture of the vessel, the payment of a fine of not more than $5,000, or imprisonment for no more than 5 years, or both. 46 U.S.C.A. section 808. Within the *280 Department of Commerce, this section of the Act is administered by Maritime. As stated above, petitioner made application on December 9, 1960, in due form, to Maritime for approval of the transfer to a foreign purchaser of the Sumatra. Petitioner stated that it was most anxious to have the approval granted prior to December 31, 1960, in a letter dated December 9, 1960, to the Foreign Transfer Branch of the Ship Transfer Division of the Maritime Administration in Washington, D.C., as follows: Confirming our conversation of earlier this week, you will find enclosed application of Tomlinson Fleet Corporation, Form MA 29, for approval of transfer of the Steamer Sumatra to Canadian interests for operation probably under British Commonwealth registry. We are writing the Collector of Customs at Wilmington, Delaware requesting Certificate of Ownership and Liens and have asked that a copy be furnished your office. As soon as possible, we will furnish you with a conformed copy of the purchase agreement. We are most anxious that approval be obtained to the transfer prior to December 31, 1960. Therefore, if you should require anything additional do not hesitate to call us collect. On December 16, 1960, Maritime *281 advised petitioner that its application was in order to be processed but it was very doubtful whether the application could be approved by December 31. On December 20, 1960, a representative of petitioner went to Washington to confer with a representative of the Maritime Administration about the application. Petitioner's representative was John T. Jaeger, an attorney and a partner in a Cleveland law firm, who was counsel for and a member of the board of directors of petitioner. At this meeting, Jaeger was advised that Maritime was considering a change in policy with respect to transfers of United States vessels to aliens, due to the worsening of relations between Cuba and the United States, and that it was very doubtful whether any definite policy would be formulated until after January 1, 1961. President-elect John F. Kennedy had not yet become the President of the United States. Jaeger understood at this conference at the Maritime Administration that approval of petitioner's application to transfer the Sumatra to Stone might be held up because of the pending considerations of changes in Maritime's foreign transfer policy. It was his understanding, also, that Maritime then had some *282 concern about whether a Canadian concern might sell a vessel to a Cuban interest, and other concerns caused by prior indications of Canada that it might sell a certain amount of wheat to Cuba. On December 21, 1960, upon his return to Cleveland, Jaeger told petitioner's directors that it was most unlikely that the application to transfer the Sumatra to Stone would be approved by Maritime by December 31, and he suggested that under the circumstances petitioner might consider selling and delivering the Sumatra to a United States purchaser, as it was not necessary to obtain approval of Maritime of a transfer of a United States vessel to a United States purchaser. Jaeger's suggestion involved the recision of petitioner's contract with Stone. Petitioner's directors agreed with Jaeger's recommendation and consulted Stone. Stone agreed to the recision of the sale by petitioner but wanted to purchase the Sumatra from the party to whom petitioner might sell and transfer the vessel. The delay at Maritime in processing petitioner's application to transfer the Sumatra to Stone was not expected by petitioner. When petitioner sold the Cuyler Adams to a Canadian purchaser in August 1960, petitioner's *283 application to make the transfer foreign on August 17 was approved by Maritime in 21 days, on September 7, 1960. When petitioner filed the application for approval of the transfer foreign of the Sumatra, petitioner expected that Maritime's approval would be given by December 31, 1960. Moreover, Maritime had published in the Federal Register its periodic amendments of its basic policy statement on foreign transfers, issued on November 5, 1956, published on November 8, 1956. The last policy change published in the Federal Register was on February 2, 1960. The policy change under consideration in December 1960, when petitioner filed its application to transfer the Sumatra to Stone, was not published in the Federal Register until August 22, 1964, (29 F.R. 12030). Being unable to obtain Maritime's approval of the transfer and delivery of the Sumatra to Stone before the end of 1960, petitioner returned the payment of $15,000 to Stone and by mutual agreement the sale contract was rescinded. On December 27, 1960, Tower Transit Corporation was incorporated under the laws of Delaware by H. J. Lester and Alfred Alexander. They, as individuals and not as officers of petitioner, *284 subscribed to all of the stock of Tower. On December 30, 1960, certificates for 1,000 shares of Tower's capital stock were issued to Lester and Alexander in equal amounts of 500 shares to each individual. The directors of Tower were Lester, Alexander, and John T. Jaeger. On December 29, 1960, in Cleveland, at the first meeting of the board of directors, the officers of Tower were elected; H. J. Lester, president; Alfred Alexander, vice-president and treasurer; and John T. Jaeger, secretary. These individuals constituted Tower's officers and directors at all times material. The stock certificate records of Tower show that on December 30, 1960, the certificates for 500 shares of the stock of Tower were issued to Lester and Alexander, respectively. Each of them subscribed for the shares of stock at one dollar per share and tendered full payment to the corporation. However, they paid for the stock on July 18, 1961. The certificate of incorporation of Tower authorizes it, in broad coverage, to transact and carry on business, including the owning and acquiring of steamships, vessels, and water craft of all kinds, and the conduct of a general freight, passenger, and towing business on *285 the Great Lakes and St. Lawrence River. Tower opened its own bank account with The Cleveland Trust Company on or about December 29, 1960, which it has continued to have. It has a resident agent in Delaware where records are kept. It also has an office in Cleveland in the Terminal Tower building. Petitioner offered to sell the Sumatra to Tower and on December 27, 1960, Tower's directors authorized Tower's purchase thereof for $37,000 to be paid by a cash payment of $12,000 and a note, without interest, for the balance of $25,000, secured by a preferred ship mortgage on the Sumatra from Tower to petitioner. On December 27, 1960, Tower and petitioner entered into a sale contract, incorporating the above provisions about the sale price and payments, and on December 29, 1960, Tower paid petitioner $12,000 under Tower's check drawn on its Cleveland Trust bank account. The sale contract provided that petitioner would deliver the Sumatra to Tower on December 29, 1960, in Cleveland, and that upon the delivery Tower would assume all responsibility for the vessel and would arrange directly with the lessor of the moorage space in the Grand River at Fairport, Ohio to lease the space where the *286 Sumatra was laid up. On December 29, 1960, petitioner executed a bill of sale to Tower, of the Sumatra, on Customs Form 1342, Treasury Department, which included a true copy of the United States Customs Certificate of Enrollment and License, and made delivery to Tower of the bill of sale and the vessel, which Tower received under a written receipt; and Tower executed and delivered to petitioner its note for $25,000, due in one year without interest, and a preferred ship mortgage on the vessel, on Customs Form 1348. The bill of sale conveying Sumatra from petitioner to Tower and the preferred ship mortgage were recorded on December 29, 1960, in the office of the Collector of Customs at Wilmington, Delaware, the home port of the vessel, and the vessel was there enrolled and licensed under the laws of the United States in the name of Tower. Under the sale contract with petitioner dated December 27, 1960, and the delivery of the vessel and the other steps taken on December 29, stated above, Tower acquired the legal title to Sumatra from petitioner. Upon acquiring the Sumatra, Tower leased the berth at Fairport where the vessel was laid up, hired a shipkeeper to look after it; and took *287 out the insurance coverage of the vessel. Tower incurred in connection therewith expenses of $2,863.95 which Tower paid with its own funds. Tower did not know how long after the acquisition it would hold the Sumatra even though Tower intended to sell the vessel. On December 28, 1960, Tower entered into a sale contract with Stone, under which Tower sold the Sumatra to Stone for $40,000, with a down payment by Stone of $15,000, the balance of $25,000 to be paid upon delivery to Stone, upon Maritime's approval of the transfer to Stone. On December 28, 1960, Stone paid Tower $15,000 under a draft of the Imperial Bank of Canada in Port Colborne, No. A 568054, bearing the same date, payable to Tower in United States funds by Chase Manhattan Bank in New York. At the meeting of the board of directors of Tower on December 29, 1960, a resolution was adopted authorizing Tower to sell the Sumatra to Stone for $40,000, and authorizing Tower's officers to take the necessary steps to effect the sale. Under the sale contract of Tower with Stone, Tower was obliged to obtain Maritime's approval of the transfer of the Sumatra to Stone. The sale contract was subject to being defeated by Maritime's *288 withholding of approval of the transfer, and if the approval should be denied Tower was to repay the $15,000 to Stone and the parties would be relieved of all obligations, one to the other. Also, Tower was to deliver and convey the vessel to Stone at 3 P.M., Eastern Standard Time, in Cleveland on the first day following the receipt of Maritime's approval of the sale and transfer to Stone. In entering into the sale contract with Tower, Stone was satisfied that it was dealing with a valid legal corporation, namely, Tower. Stone purchased the Sumatra from Tower. Stone did not have any recourse against petitioner with respect to acquisition of the vessel. On February 1, 1961, Tower made application to Maritime Administration on Form MA-29, as the owner, for the approval required by the Shipping Act of transfer of the Sumatra to Stone for British registration under the British Commonwealth flag. In the application, Tower stated that it had acquired the vessel in 1960 from Tomlinson Fleet Corporation at the cost of $37,000. Maritime eventually approved the transfer of the vessel to Stone for British registry upon several conditions imposed by Maritime in an agreement dated February 27, 1961, prepared *289 by Maritime for execution by Stone, which was eventually executed by Stone; and Stone agreed to comply with the conditions and to execute, as a guarantee of its agreement with Maritime, a bond, Form MA-104 of Maritime, in the sum of $25,000, and to deposit and pledge with Maritime, as security to the United States, United States bonds in the total amount of $25,000. In the agreement of Maritime with Stone, Stone agreed inter alia that there would not be any further transfer of ownership of or change in the registry of the Sumatra without the prior written approval of Maritime. Stone agreed to several other conditions required by Maritime. Upon default of compliance with the conditions, Stone would be subject to penalties under the Shipping Act and the execution of the bond and deposit of securities were to secure the United States against any such default by Stone. Maritime also issued its order, No. MA-6643, approving transfer of the vessel from Tower to Stone. While the order of Maritime approving the transfer of the Sumatra to Stone was dated February 27, 1961, such order was not sent by and received from Maritime until April 26, 1961. Subsequently, the Permanent Frontier Enrollment, *290 No. 79, of the Sumatra, which had been issued to Tower at Wilmington, Delaware, on December 29, 1960, was surrendered by Tower at Wilmington, Delaware, on May 5, 1961, for the reason that the vessel had been transferred to Stone and was transferred to British registry and flag pursuant to Maritime Administration Order No. MA-6643. As a further condition of approving the transfer of the Sumatra to Stone, Maritime required Stone to appoint a resident agent in the United States. This was pursuant to the Maritime Administration's ship transfer policy which required that: All foreign transferees, whether corporate entities, associations, companies, partnerships, individuals or joint ventures, which or who have been granted approvals by the Maritime Administration, pursuant to the provisions of section 9 and/or 37 of the Shipping Act, 1916, as amended (46 U.S.C. 808 and 835) shall, prior to the issuance and delivery of Transfer Orders covering the vessel or vessels to be transferred, appoint and designate a resident agent in the United States to receive and accept service *291 of process or other notice in any action or proceeding instituted by the United States of America relating to any claim arising out of the approved transaction. The appointment and designation of the resident agent, as aforesaid, shall not be terminated, revoked, amended or altered without the prior written consent and approval of the Maritime Administration. The resident agent designated and appointed by the foreign transferee shall be acceptable to the Maritime Administrator; and, to be acceptable, the resident agent must maintain a permanent residence in the United States of America. * * * (22 F.R. 4289). In compliance with the Maritime Administration requirements, Stone appointed Tower as its resident agent in the United States on April 19, 1961, which was approved by Maritime. The bond of Stone to Maritime has not been rescinded; Stone has complied with the conditions. Tower is still the United States resident agent of Stone. Upon Tower's receipt of Maritime's approval order, Tower delivered the Sumatra to Stone in Cleveland on April 28, 1961. Stone paid Tower $25,000 through Chase Manhattan Bank; Tower delivered to Stone the bill of sale conveying the vessel, *292 dated April 27, 1961, which included a copy of the Certificate of Enrollment and License of the vessel in the name of Tower, in which it is stated that Tower was the sole owner. Tower also delivered to Stone a Certificate of Ownership, a Customs Form, certified by the Collector of Customs on April 11, 1961, stating that Tower owned good title to the vessel. Stone required the certificate in order to register the vessel under British navigation laws. Stone placed the vessel under British registry and flag and so advised Maritime on April 28, 1961. The Collector of Customs at Wilmington issued his certificate on May 5, 1961, stating that the Permanent Frontier Enrollment of the Sumatra, issued to Tower on December 29, 1960, had been surrendered on May 5 upon the transfer of the vessel [to Stone] under Maritime's transfer order dated February 27, 1961. Another step in completing the transfer to Stone was Stone's execution on April 28, 1961, of a Shipper's Export Declaration for exporting the Sumatra to itself as the consignee. Under this declaration, Stone appointed Tower as its exporting agent for export control and customs purposes. On May 1, 1961, Tower paid $25,000 to petitioner, *293 the balance due for the purchase of the vessel, in satisfaction of its indebtedness under its note to petitioner dated December 29, 1960, and the sale contract of the same date. Since its incorporation, Tower has filed income tax returns, annually. Tower is at the present time a corporation in good standing under the laws of Delaware, duly authorized to transact business. There was not any oral or written agency agreement between petitioner and Tower at any time. There was not and is not any affiliation of any kind of Stone with either petitioner or Tower, nor any common stock ownership, nor common officers and directors of Stone and either Tower or petitioner. Ultimate Findings Petitioner, for actual and real business purposes, intended to sell the Sumatra in 1960, but was effectively prevented from delivering and transferring the vessel in 1960 to a foreign purchaser by reason of pending policy considerations of the Maritime Administration relating to transfers foreign which brought about delays in the ordinary course of Maritime's approval of such transfers. Petitioner sold the vessel in December 1960 to a domestic purchaser for bona fide and real business purposes. *294 On December 29 1960, petitioner made a bona fide sale of the vessel, in a completed and closed transaction with transfer and delivery of the vessel, to Tower. Tower is a valid and legal corporate entity which was organized to engage in and has engaged in actual and real business activities. Tower is not and was not a fictitious or dummy corporation. Tower engaged in business activities. It purchased the Sumatra from petitioner and thereafter held and controlled this property. It made a bona fide sale of the vessel to Stone, undertook complex responsibilities for arranging for the transfer foreign of the vessel, and carried on the necessary negotiations with Maritime for the transfer and delivery of the vessel to Stone. Petitioner sustained a loss in 1960 in the amount of $141,824.75 upon the sale of the vessel to Tower, a separate and valid corporation. Opinion The question for decision is whether petitioner sustained a loss in 1960 of $141,824.75, within section 165(a), 1954 Code, as a result of a transaction between itself and Tower Transit Corporation involving the sale and transfer to Tower of the Sumatra. The loss is the difference between the selling price, $37,000, and *295 the adjusted basis, $178,824.75. There is no dispute about the basic facts. Respondent does not question the bona fides and reality of the offer in 1960 to purchase the Sumatra which was made by Stone, the Canadian corporation, and the purchase by Stone. The parties are agreed that the taxable year 1957 is the only year available to the petitioner for the application of any net operating loss sustained in 1960 for the purpose of carrying over such net operating loss. Petitioner agrees that it endeavored to bring the sale of the Sumatra within the taxable year 1960 because there would result a net operating loss and a loss carryback to 1957, but contends that this was not the sole reason for selling the vessel in 1960. There has not been any problem about the general facts and the steps followed by the petitioner, and there has been cooperation by the parties in their mutual endeavor to arrive at a correct and just result for income tax purposes. It is noted at the outset that petitioner had a right, recognized in federal tax law, to arrange a bona fide business transaction in such way as *296 to realize a tax benefit which is allowed as a matter of law provided that the transaction comes within the statutory allowance. Gregory v. Helvering, 293 U.S. 465. Section 165(a) of the Code provides that there shall be allowed as a deduction any loss sustained during the taxable year, not compensated for by insurance or otherwise. The parties have narrowed the question to the sale transaction between petitioner and Tower Transit Corporation, to which petitioner transferred and delivered the vessel in 1960. A vessel enrolled and registered under United States laws is a particular kind of property, the transfer and delivery of which to a foreign purchaser are subject to regulations of the Government under the Shipping Act of 1916. The problem in this case is unusual because of the regulations of the Maritime Administration relating to the transfer and delivery of a vessel to a foreign purchaser. Those regulations do not apply to the transfer and delivery of such registered vessel to a United States purchaser. The special circumstances here require consideration of the background facts. With respect to the transaction between petitioner and Stone, the parties, on their *297 briefs, have not sufficiently, we believe, dealt with the factor of the Government's regulations about the delivery of a registered vessel to a foreign purchaser and the element of "delivery" in the sale of such vessel. Delivery is only one factor in the sale of property. Since the parties have not presented arguments relating to the general principles of sales, as applied to the sale of the particular type of property in issue and to the transaction of petitioner with Stone, we do not discuss them, but are aware of that aspect of the basic problem. Petitioner determined early in 1960 that it would sell the Sumatra, if it could do so, for valid business reasons, because it was a small vessel that was not profitable to operate. Petitioner endeavored to sell it early in 1960 for as much as $150,000, but could not do so. The decision to sell the Sumatra was part of a general policy to dispose of some uneconomical vessels, and in 1960 petitioner sold two other vessels. Stone is a Canadian corporation which is unrelated to petitioner. Stone made a bona fide offer to purchase the Sumatra for $40,000, in November or early in December 1960, which petitioner accepted, and Stone paid $15,000 *298 on December 9, 1960, as a down payment. Since the purchaser was foreign and not a United States corporation, the transfer and delivery of the vessel to Stone had to be approved by the Maritime Administration due to federal law. This meant that Maritime would fix the date of the delivery of the vessel to Stone rather than the parties to the sale contract. The provision in the contract about delivery upon Maritime's approval was included in the sale contract of petitioner with Stone solely in compliance with Maritime's regulations under the Shipping Act and because of penalties, such as forfeiture of the vessel if transferred to a foreign purchaser without such approval. Nevertheless, the sale contract between petitioner and Stone was a bona fide and valid business contract of sale under which all steps were completed in December 1960, as between the parties. This contract was, therefore, an effective and binding sale contract in 1960, as between the parties, subject only to being defeated by Maritime if that agency of the Government withheld approval of delivery of the vessel to Stone, which was a condition subsequent in the contract. It was the intention of petitioner in 1960, when *299 the contract was executed, to sell and of Stone to purchase. Moreover, petitioner had reason to believe that Maritime would and could approve in December 1960 the transfer foreign because earlier in 1960 Maritime had approved in 21 days petitioner's application to transfer the Cuyler Adams to a Canadian purchaser. In the instance of petitioner's application to Maritime for approval of the transfer of the Sumatra to another Canadian buyer, petitioner did not know beforehand about Maritime's pending considerations of amendments to its foreign transfer policies, and it was because of Maritime's delays and policy problems, beyond petitioner's control, that petitioner could not obtain the approval and deliver the vessel, a Great Lakes steamer, in December 1960 to Stone. Under the circumstances, petitioner decided to abandon its efforts under its contract with Stone upon learning that Maritime would not give the required approval so that petitioner could deliver the vessel before the end of 1960. There were regulations relating to the sale and delivery of the vessel to a United States, or domestic, purchaser, but petitioner could comply with them in 1960. Petitioner sold and delivered *300 the vessel to Tower in 1960. Petitioner contends that in so doing, it in effect "abandoned" the vessel in 1960, and that within the reasoning of Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 34 B.T.A. 177, the loss deduction claimed in 1960 should be allowed. This is one ground upon which petitioner claims the loss deduction. In Minneapolis, St. Paul and Sault Ste. Marie Ry. Co., supra, pp. 185-186, a similar problem was considered by this Court, involving a loss from abandonment of some of the taxpayer's railway property. The year of the claimed loss was 1929. We held that the loss actually occurred in 1929 because the taxpayer abandoned the property in 1929, and we allowed a loss deduction in 1929. Approval of the abandonment was required by the Interstate Commerce Commission, which gave its approval early in 1930. We held (p. 186) that the "abandonment" referred to in the relevant provision of the Interstate Commerce Act did not have any necessary bearing "upon the question of loss for income tax purposes. The deduction of a loss for income tax purposes is not withheld by that act until the permission of the [Interstate Commerce] Commission had *301 been obtained. * * * The test for tax purposes is a practical one." We believe that the reasoning of the Minneapolis case applies here and is authority for allowing the loss deduction in 1960. We turn now to petitioner's sale contract with Tower and the alternative question which is whether petitioner's sale and delivery of the Sumatra to Tower in 1960 established a loss under section 165(a). Respondent contends that Tower should not be recognized as a separate corporation and tax entity and that petitioner's sale to Tower should be held to be a nullity for tax purposes. He argues that the sale by Tower to Stone should be attributed to petitioner and that, if so, that sale was not made and the loss was not sustained by petitioner in 1960. We are not able to agree with respondent's contentions. Under the particular facts and circumstances of this case, we believe it would be error to disregard both the separate corporate entity of Tower and petitioner's sale of the Sumatra to Tower. Steamships, documented under the laws of the United States, may not be sold or disposed of as ordinary chattels even where an American purchaser is involved. *302 The Act of June 5, 1920, as amended, 46 U.S.C.A. § 921, provides that no sale, conveyance or mortgage which includes a vessel of the United States or any portion thereof, shall be valid in respect to such vessel against any person other than the grantor or mortgagor until such bill of sale, conveyance or mortgage is recorded in the office of the Collector of Customs of the port of documentation of such vessel. For purposes of the navigation laws and documentation, every vessel of the United States must have a home port, which port the owner, subject to the approval of the Commissioner of Customs, must specifically fix. 46 U.S.C.A. § 18. The home port of the Sumatra was Wilmington, Delaware. In addition, every vessel of the United States navigating the northern frontiers, i.e., the Great Lakes, otherwise than by sea, must be enrolled and licensed, which enrollment and license authorizes the vessel to be employed either in the coasting or foreign trade on such waters. 46 U.S.C.A. § 258. Previous to granting an enrollment and license for any vessel owned by an incorporated *303 company, the president or secretary must attest in writing to the ownership of such vessel. 46 U.S.C.A. § 254. The sale of the Sumatra by petitioner to Tower was perfected by filing and recording the bill of sale and preferred ship mortgage in the office of the Collector of Customs at Wilmington on December 29, 1960, who then issued the enrollment and license showing ownership to be in Tower. Thus, as a matter of law, Tower, as of December 29, held good and sufficient legal title to the Sumatra. For purposes of the navigation laws and the Shipping Act, 1916, as amended, Tower was a recognized legal entity. It was able to convey in its own name, good and sufficient legal title to the Sumatra to Stone. In this transaction it was engaging in a legitimate business activity. Its contract with Stone was valid, binding, and enforceable in a court of admiralty. The Vidal Sala, 12 F. 207. Tower is a duly organized corporation which is still in existence. It was not organized by petitioner and petitioner does not own and never has owned any of its stock. The charter of Tower authorizes it to engage in business and commercial activities; it engaged in *304 business. Tower is not a fiction and it was not a mere dummy corporation. Tower executed a valid contract to purchase a registered vessel from petitioner, and took delivery, possession, and control thereof, which entailed the responsibilities of securing insurance on and dock space for the vessel, and a shipkeeper. Tower thereafter entered into a valid contract of sale of the vessel with Stone under which it was obligated to carry on negotiations with Maritime for approval of the delivery of the vessel to Stone, all of which was done by Tower. Tower actively negotiated with Maritime and obtained its approval of the delivery of the vessel to a foreign purchaser. Maritime required Stone to appoint an agent, resident in the United States, under its policy relating to transfers foreign. 22 F.R. 4289. In compliance, Stone appointed Tower as its United States resident agent, which Maritime approved. In order to be acceptable to Maritime, the resident agent of a foreign owner of a vessel must maintain a permanent residence in the United States. Tower has complied with this requirement. The Collector of Customs at Wilmington, Delaware, certified that Tower had legal title to *305 the Sumatra, which had been acquired on December 29, 1960. When Stone filed a shipper's export declaration, it declared therein that Tower was its United States resident agent. Tower incurred expenses, which it paid out of its own funds, and it realized gain in 1961, which it reported in its return. All of these matters constituted actual and real business activities of Tower. Franklin C. Law, a Canadian citizen, the president of Stone, testified that Stone regarded Tower as a legal corporate entity and intended to, and believed that it did, enter into a valid and binding contract with Tower to purchase the vessel from Tower; and that Stone complied with Maritime's requirements when it appointed Tower as its United States resident agent. The bond put up by Stone, required by Maritime, is still in effect; Stone has not breached its obligations under the bond. All of the transaction between Tower and Stone was carried out by each of them, respectively. Maritime recognized Tower as the owner of the Sumatra, and in Maritime's transfer order of February 27, 1961, it approved the transfer application of Tower and Tower's sale to Stone. All other official records of the transfer and delivery *306 of the vessel to Stone state that Tower was the owner and transferor. We cannot find, upon the evidence, that Tower was an agent of petitioner, or that the seller of the vessel was petitioner. Under the reasoning of Moline Properties, Inc. v. Commissioner, 319 U.S. 436, affirming 131 F. 2d 388, Tower should be and is recognized as a separate corporate entity, which was organized to carry on legitimate business activities and did so after its organization. Under the facts and circumstances of this case, Tower's separate corporate entity cannot be ignored. See, also, National Investors Corporation v. Hoey, 144 F. 2d 466, 467-468, (C.A. 2, 1944); and Columbian Rope Co., 42 T.C. 800, 813. It is concluded under the evidence here that Tower was a separate corporation having substance. It is concluded, further, that petitioner entered into a bona fide and valid sale contract with Tower, which must be recognized, and that petitioner made a complete sale and transfer of the Sumatra to Tower in December 1960, under which Tower acquired complete ownership of and control over the Sumatra and paid the contract price. It is held that under *307 the sale of the Sumatra to Tower, petitioner sustained a loss in 1960 of $141,824.75 within section 165(a). Because of other uncontested adjustments of the respondent, a Rule 50 computation is required. Decision will be entered under Rule 50.